ARMANDO ALEJANDRO, peticionario, *v.* TRIBUNAL SUPERIOR DE PUERTO RICO, SALA DE SAN JUAN, HON. FRANCISCO ESPINOSA, JUEZ, demandado; NUMIDA GONZÁLEZ VDA. DE GARCÍA, interventora.

*Números:* O-71-77, O-71-101          *Resueltos:* 21 de abril de 1972

*Daniel Pellón Lafuente,* abogado del peticionario; *Francisco Ponsa Feliú, Wilson F. Colberg* y *Miguel A. Valldejuli,* abogados de la interventora.

EL JUEZ ASOCIADO SEÑOR DÁVILA emitió la opinión del Tribunal.

Estos recursos plantean si fue por justa causa la remoción del albacea contador-partidor de la herencia testada de José María García Veiga.

García Veiga era oriundo del ayuntamiento de Pastoriza, provincia de Lugo, España. Estaba casado con Numida González Mena. Falleció el 3 de diciembre de 1967. Sus padres le habían premuerto. Dejó considerables bienes en España y Puerto Rico. No dejó descendientes. Su último testamento abierto lo otorgó el 11 de febrero de 1965. (¹)

---

(¹) El testador dispuso de sus bienes en la siguiente forma:

a) Respecto a la parte de ellos sita en Puerto Rico, en primer término, hizo once legados en metálico montantes a $10,000, a favor de nueve personas naturales y dos entidades jurídicas determinadas que identificó debidamente.

En segundo término, "en el remanente de todos los bienes relictos al fallecimiento del testador, después de pagados los gastos necesarios y de satisfacer todos los legados . . . en relación con los bienes sitos en Puerto Rico, y en cuanto a un Cincuenta Por Ciento (50%) de los mismos, instituye por sus únicos y universales herederos por partes iguales, a su hermano Ramón García Veiga, a la esposa de éste, Carmen Martínez, a sus sobrinos, hijos de dichos esposos, Hilda o Gilda, Concepción, Esperanza, Carmen e Isabel García Martínez; y en cuanto a un Treinta Por Ciento (30%) de dicho caudal hereditario, a su esposa Numida González Mena y la cuota usufructuaria que le corresponde. . . .

El 20% restante de esos bienes sitos aquí lo dejó, por partes iguales, a sus hermanos paternos llamados Genoveva y Constantino y a los sucesores de su hermana Josefa García Salgado, todos residentes en España.

b) "En cuanto a los bienes del caudal hereditario que existen en España . . . instituye como sus únicos y universales herederos por partes iguales, a sus hermanos de padre, residentes en España, llamados, Genoveva y Constantino y a la sucesión de su fallecida hermana, Josefa García Salgado, compuesta de sus hijos Ángel, Manuel, Luis, José María, Marina, Alicia, Blanca y Paz.

En cuanto a los bienes sitos en España hizo los siguientes tres legados:

(1) Todos los bienes que había adquirido por herencia materna, radicados en la Parroquia de Milleirós, Provincia de Lugo, para sus primos Manuel e Isabel Onega Veiga y a los hijos de su otra prima, Carmen Onega Veiga, cuyos nombres no indicó.

(2) Para Genoveva y Constantino y a los sucesores de su hermana Josefa García Salgado, su participación en cuentas corrientes en varios bancos españoles.

(3) Para su viuda Numida González Mena, la participación de una

El testador "prohíbe la intervención judicial en las operaciones de su testamentaría, mandando que se hagan privadamente; y nombra albaceas testamentarios para que ejecuten y cumplan este testamento y al mismo tiempo como contadores partidores de la herencia con la facultad necesaria para cumplir su encargo, en cuanto a la herencia en Puerto Rico, a los mayores de edad y vecinos de San Juan, Puerto Rico, Don José María Infanzón Trelles, Don Guillermo Infanzón Trelles y don Armando Alejandro y en caso que éste falleciese, a su esposa Gilda García de Alejandro, entendiéndose estos nombramientos, con carácter sucesivo, es decir, el primero ejercerá su cargo y en caso que por alguna razón no pueda desempeñarlo, le sustituirá el segundo y así sucesivamente, hasta el último; y en cuanto a la herencia en España, nombra albaceas testamentarios a Don Guillermo Ocampo, casado con su sobrina Pilar García Mazoy; y a Manuel Salgado Blanco, el primero residente en Saldanje, Lugo, y el segundo en Calle Carmen Número Doce, Madrid, España, en las mismas condiciones que los de Puerto Rico y por la presente le extiende a los albaceas nombrados para Puerto Rico y España, el término que fija la ley, a todo el que fuere necesario para desempeñar su cometido sin presentación de fianza."

Los dos hermanos Infanzón Trelles, designados albaceas contadores partidores respecto a los bienes hereditarios sitos en Puerto Rico y para actuar en primer y segundo lugar, expresaron por escrito la no aceptación del cargo, en 15 de diciembre de ese año. Tres días después lo aceptó don Armando Alejandro, prestando por escrito el debido juramento. Le fue expedida la correspondiente carta testamen-

---

cuenta corriente en un banco de La Coruña, y en una casa llamada El Foro, y

(4) Los bienes que tenía en España, por herencia de su padre, para su hermano Constantino.

Por la cláusula Décima excluyó a sus herederos residentes en Puerto Rico—en los cuales estaba su viuda, y heredera forzosa—"de toda participación en cuanto a los bienes sitos en España."

taria por resolución del tribunal de instancia de fecha 17 de enero de 1968.

Luego entró en funciones de su cargo. El 25 de marzo de 1968 radicó la notificación de defunción, exigida por ley, para la determinación de la contribución de herencia a pagarse. Con la conformidad de la mayoría de los herederos, solicitó y en 20 de enero de 1970 se le concedió, una prórroga del plazo del albaceazgo, para vencer después de la liquidación y notificación de la contribución de herencia. Realizó otras gestiones en beneficio de la parte del caudal hereditario sita en Puerto Rico, que eventualmente se repartiría por él como contador-partidor.

En 21 de enero de 1970, la viuda doña Numida González Mena solicitó del tribunal de instancia se declarara terminado el albaceazgo y se le nombrara administradora judicial de la herencia, por haber expirado el plazo legal fijado para su desempeño. Después de ser sometida tal solicitud por sendos alegatos, fue desestimada. Igual suerte corrió una moción de reconsideración.

En ese estado del albaceazgo, las coherederas Esperanza, Carmen, Isabel y Concepción García Martínez, sobrinas del causante, en 30 de abril de 1970, como demandantes, iniciaron ante la misma Sala de San Juan una acción sobre nulidad del último testamento abierto otorgado por don José María García Veiga, contra su viuda Numida González Mena. Se unió a la otra sobrina Gilda García Martínez, como parte demandada, por haber rehusado unirse como parte demandante. [2]

Se alegó en la demanda que dicho testamento "es nulo y sin ningún valor ni efecto" porque, en su fecha, el testador se encontraba totalmente incapacitado mental y físicamente y no estaba en condiciones de otorgar válidamente disposición de última voluntad y, en la alternativa, porque fue otorgado mediante dolo, intimidación y violencia. Se adujo también que

---

[2] No se incluyeron como demandados a los otros herederos y legatarios a que se hace referencia en el escolio 1.

estaba viciado de nulidad porque "no se inscribió en el Registro de Testamentos del Tribunal Supremo de Puerto Rico durante las veinticuatro horas siguientes a su otorgamiento."

Se solicitó por las demandantes que de declararse nulo el testamento abierto otorgado el 11 de febrero de 1965, se declarase subsistente el que él había otorgado el 2 de junio de 1955 mediante el cual "se le reconoce a las demandantes conjuntamente con la demandada Gilda García Martínez, por sí y como herederas de su padre Ramón García Veiga, el 80% del caudal hereditario . . . sin que se le reconozca nada a la demandada Numida González Mena como heredera de su finado esposo, excepción hecha de la cuota usufructuaria viudal."

En el mismo día 30 de abril de 1970, fueron emplazadas la viuda demandada y la otra coheredera demandada involuntaria. Ésta no compareció para fin alguno en la acción por lo que en 29 de mayo siguiente se anotó su rebeldía.

El 23 de junio de 1970, la viuda contestó la demanda. Aceptó varios de los hechos alegados y negó los demás. Como defensas afirmativas expuso que la demanda no alegaba hechos que justificaran la concesión de remedio alguno y que el testamento cuya validez se impugnaba "es válido y legal, habiéndose observado en su otorgamiento, todos los requisitos de ley, y habiendo el testador estado en condiciones de testar según requiere la ley." Solicitó la desestimación de la demanda.

No se hizo parte en esa acción al albacea Armando Alejandro.

En 25 de agosto de 1970, la viuda radica otra moción para remover al contador-partidor. Expuso en la moción:

"4—Entiende . . . que el actual albacea . . . está descalificado para actuar como tal y/o [*sic*] debe ser removido de su cargo . . . por las siguientes razones:

"a) Porque siendo la facultad más importante que la ley concede al albacea la de vigilar la ejecución del testamento y sos-

tener su validez en juicio y fuera de él, el actual albacea no tiene ni el propósito ni la intención de hacer tales cosas, ni ha realizado acto alguno hasta este momento encaminado a tales fines a pesar de que la validez del testamento bajo el cual fue nombrado ha sido impugnada ante este mismo Tribunal en el pleito Civil Núm. 70–20006, Esperanza, Carmen, Isabel y Concepción García Martínez v. Numida González Mena y Gilda García Martínez, demandadas, sobre: Nulidad de Testamento y otros extremos.

b) Porque el albacea tiene un claro interés conflictivo con la compareciente por cuanto es esposo de Gilda García Martínez, quien tiene intereses comunes idénticos a las demandantes en el mencionado pleito, a pesar de figurar como co-demandada.

c) Porque hay una patente incompatibilidad entre los deberes del albacea en funciones y los intereses de la compareciente, especialmente en vista de su aludida relación con la dicha Gilda García Martínez."

A la misma formuló oposición el albacea en los siguientes términos:

"1) En cuanto a la alegación 4, inciso (a) de la moción, el albacea alega que él no ha sido demandado en el pleito a que se refiere dicha alegación habiendo sido demandadas las herederas mencionadas en la misma; alegando además que de acuerdo con el artículo 824 del Código Civil, 1930, el albacea debe vigilar la ejecución del testamento y sostener su validez en juicio y fuera de él, si lo creyere justo; y que no habiendo sido demandado en dicho pleito no tiene que intervenir.

2) En cuanto al inciso (b) de la alegación 4 de la moción, alega que no existe interés conflictivo con la heredera Gilda García Martínez ya que el testador expresó su voluntad nombrándolo albacea a pesar de conocer dicha situación y alega además que el albacea representa al testador y no a la herencia; por lo que no procede haber conflicto de intereses.

3) Niega lo alegado en el inciso (c) de la alegación 4a. de la moción alegando además que siendo el albacea el mandatario del testador y no de la herencia, no puede haber conflicto entre los herederos y el albacea, ya que éste deriva su autoridad de la voluntad del testador y del testamento que lo nombre y siendo el testamento la ley de la herencia éste tiene que ser acatado por los herederos mucho más si son voluntarios."

El 18 de septiembre de 1970 se celebró la vista sobre los méritos de esta solicitud de remoción, compareciendo la viuda y el albacea contador-partidor representados por sus respectivos abogados. La parte proponente, ofreció como única evidencia documental suya, los autos del caso sobre nulidad de testamento y, como su única evidencia testifical, presentó el testimonio del propio señor Alejandro. Esa fue toda la evidencia aportada en apoyo de la remoción debatida en esa vista. Con la presentación de alegatos por ambas partes quedó el asunto sometido para resolución.

En 1 de diciembre de 1970, el tribunal de instancia dictó resolución decretando la remoción del albacea contador-partidor, la cancelación de la carta testamentaria y la rendición de las cuentas finales del albaceazgo dentro de 15 días. [3] Se negó a reconsiderar su decisión.

A solicitud del albacea decidimos revisar tal resolución.

En 25 de marzo de 1971 el albacea contador-partidor solicitó del tribunal recurrido una segunda prórroga del término

---

[3] El texto de tal resolución en su parte pertinente expresa:

".         .         .         .         . .         .         .         .

"La posición de la peticionaria es que el albacea no ha intervenido en el caso de impugnación del testamento porque de declararse judicialmente que dicho testamento es nulo ello favorecería a su esposa bajo los términos de un testamento anterior que entonces quedaría en vigor. A preguntas de la representación legal de la peticionaria sobre este extremo el albacea no respondió. Quedamos convencidos por la propia declaración del albacea que él ha decidido no intervenir en el caso de la impugnación del testamento porque ello beneficiaría a su esposa, aunque él personalmente no se beneficie.

.         .         .         .         .         .         .         .

"A nuestro juicio, al cruzarse de brazos ante la impugnación del testamento, el albacea Sr. Alejandro no ha cumplido con su obligación más importante, la defensa de la validez del testamento.

"El Artículo 832 del Código Civil establece que el albaceazgo termina, entre otras razones, por la remoción del albacea. Guarda silencio el Código en cuanto a las razones para la remoción. Ello se deja a la discreción de la autoridad judicial. A nuestro juicio, y por lo expresado anteriormente, el albacea debe ser removido de su cargo.

Se cancelan las cartas testamentarias expedidas a favor de Don Armando Alejandro el día 17 de enero de 1968 y se le ordena rendir las cuentas finales de su albaceazgo dentro del término de 15 días."

de su cargo, bajo la principal razón de que, a pesar de sus gestiones, el Departamento de Hacienda no había aún liquidado la contribución hereditaria a pagarse. A ello se opuso la viuda, alegando que dicha prórroga "no puede concederse ni debe ser concedida por cuanto este Tribunal ordenó la remoción del albacea mediante Resolución de fecha 1ro. de diciembre de 1970."

Discutida en corte esta solicitud de prórroga del albaceazgo, el tribunal de instancia la desestimó, aduciendo como razón para ello, lo siguiente, conforme a la minuta del 23 de marzo de 1971:

"Oídos ambos letrados el tribunal hace constar que su resolución del 30 de marzo de 1970—fecha de la primera prórroga—fue expresa, no excederá la prórroga de un año."

El albacea contador-partidor, en el mismo día en que se le denegó la prórroga, invocando lo dispuesto por el Art. 826 de nuestro Código Civil, (⁴) solicitó la reconsideración.

Se negó a reconsiderar el tribunal de instancia, ". . . por haberse dictado la resolución de 1ro. de diciembre de 1970 removiendo de su cargo al albacea." También decidimos revisar esta otra resolución. Ambos recursos fueron consolidados.

El Art. 832 de nuestro Código Civil (⁵) enumera las causas que dan lugar a la terminación del albaceazgo, incluyendo entre ellas la remoción de albacea. Guarda silencio, en cuanto a las razones para la remoción.

En España se produce el mismo silencio en el Art. 910 de su Código Civil. Pero allí la jurisprudencia del Tribunal

---

(⁴) El Art. 826 del Código Civil de Puerto Rico, Ed. de 1930 (31 L.P.R.A. sec. 2523) dispone:

"El albacea a quien el testador no haya fijado plazo, deberá cumplir su encargo dentro de un año contado desde su aceptación, o desde que terminen los litigios que se promovieren sobre la validez o nulidad del testamento o de alguna de sus disposiciones."

(⁵) Lee así el Art. 832 (31 L.P.R.A. sec. 2529):

"Termina el albaceazgo por la muerte, imposibilidad, renuncia o remoción del albacea, y por el lapso del término señalado por el testador, por la ley, y en su caso, por los interesados."

Supremo y los comentarios de los más acatados juristas, en gran parte lo han suplido.

██ En cuanto a la jurisprudencia española, Albaladejo la resume así en su reciente obra *El Albaceazgo en el Derecho Español* (1969) a la pág. 572:

"En definitiva, resumiendo: el T.S. en su jurisprudencia ha dicho que son causas de remoción:

1a. Las que incapacitan para el desempeño del cargo (sentencias de 4 de febrero de 1902 y de 5 de julio de 1947).

2a. Las que incapacitan para el ejercicio de los derechos civiles (sentencia de 4 de febrero de 1902).

3a. La conducta dolosa en el desempeño de su misión (sentencias de 4 de febrero de 1902 y de 5 de julio de 1947).

4a. El uso malicioso (en perjuicio de los llamados a la herencia) de facultades que no les asistan (sentencia de 5 de julio de 1947).

5a. La negligencia y la mala administración que (aun admitiendo que el cargo se concediese por el tiempo necesario para cumplir el testamento) supone estar un plazo excesivo (treinta y tres años) sin ni siquiera haber formalizado el inventario y tasación de los bienes relictos (sentencia de 18 de febrero de 1908)."

Castán ha sintetizado las causas que dan lugar a la remoción del modo siguiente:

"Incurre el Código en la imperdonable deficiencia de no desenvolver esta materia señalando cuáles han de ser las justas causas que den lugar a la remoción. Algunos comentaristas llegaron a suponer, ante la omisión de la ley, que no había términos hábiles para promover con fortuna especie alguna judicial de remoción. Otros, como Mucius Scaevola, entendieron que podrían aplicarse por analogía, las causas que dan lugar a la extinción del contrato de mandato y las que producen indignidad para suceder. Hoy está, en gran parte, subsanado el vacío del Código por la jurisprudencia del Tribunal Supremo.

Sienta, en efecto, la sentencia de 4 de febrero de 1902 esta importante doctrina: a) Que no puede el silencio de la ley en punto a las causas de remoción de los albaceas, ser suplido con la aplicación analógica de lo estatuido con referencia a alguna

otra institución jurídica, pues la única, con motivo de la cual el Código civil trata de remoción de cargos, es la tutela, institución que ni por la causa que le sirve de fundamento, ni por su peculiar organismo, ni por la finalidad a que responde, tiene analogía con el albaceazgo. b) Que, dada la falta de ley expresa, y con subjeción a los principios generales del Derecho, según los cuales las leyes prohibitivas y las que envuelven una sanción penal, no pueden en modo alguno interpretarse extensivamente, las causas de remoción de los albaceas no deben ser otras que las que incapacitan para el desempeño del cargo o para el ejercicio de los derechos civiles, por la razón fundamental de que no puede desempeñar cargo alguno el que incurra en incapacidad legal para obtenerlo, y, además, la conducta dolosa de los albaceas, causa que se deriva, primero, del principio inconcuso de que no debe ejercer función ni desempeñar cargo, debido exclusivamente a la confianza del testador, el que por actos engañosos o fraudulentos se hace indigno de ella y evidencia que carece de la condición esencial a la que debe su nombramiento, y segundo, del racional fundamento de que no puede ser ejecutor de la voluntad del finado quien maliciosamente la contraría.

La sentencia de 18 de febrero de 1908 completa la doctrina dando a entender que también la negligencia, cuando es rayana en el dolo, puede estimarse como causa de remoción, pues establece que procede conceptuar como tal el incumplimiento durante larguísimo tiempo de la voluntad del testador y la abusiva gestión en cuanto al manejo de los bienes, revelada principalmente por la falta de inventario de los que el testador dejó a su fallecimiento.

A juicio de Alcubilla, es claro, además, que procede la remoción si el albacea contraviene a la prohibición establecida en el número 3o. del art. 1.459, comprando por sí o por persona intermedia bienes confiados a su cargo." Castán, *Derecho Civil Español, Común y Foral,* Tomo IV, págs. 620–622, ed. 1944.

Ver además: Albaladejo, *El Albaceazgo en el Derecho Español,* Parte VII, págs. 563–586 (1969); Sánchez Román, *Código Civil,* Tomo VI-2do., pág. 1461; Gómez Morán, *"El Ejecutor Testamentario en el Derecho Comparado,"* pág. 170; Roca Sastre en Kipp, Tomo V-2do., pág. 273; Osorio Morales, *Manual de Sucesión Testamentaria,* Madrid, 1957 ed. por Instituto de Estudios Políticos, pág. 460; Luis Puig Ferriol,

*El Albaceazgo,* págs. 256–258, ed. Bosch, Barcelona, 1967; Valverde, *Tratado de Derecho Civil Español,* Tomo V, pág. 366, 4ta. ed. 1939, Valladolid.

■ A la luz de lo expuesto: ¿Existió causa justa que diera lugar a la destitución del albacea contador? Obviamente no. Analicemos las dos razones que expresa el tribunal de instancia para separarlo de su cargo:

(1) ". . . Quedamos convencidos por la propia declaración del albacea que él ha decidido no intervenir en el caso de la impugnación del testamento porque ello beneficiaría a su esposa, aunque él personalmente no se beneficie."

(2) "A nuestro juicio, al cruzarse de brazos ante la impugnación del testamento, el albacea señor Alejandro no ha cumplido con su obligación más importante, la defensa de la validez del testamento."

La primera está integrada por una afirmación obviamente equivocada y por una conclusión que, no solamente resulta injusta para el albacea, sino que no está sostenida por la única evidencia aportada por la viuda en su intento de establecer una justa causa de remoción.

El albacea, único testigo ofrecido por la parte obligada a probar esa justa causa, jamás dijo en términos absolutos, que "él había decidido no intervenir." Y menos puede derivarse la conclusión de que no intervenía porque la impugnación del testamento beneficiaba a su esposa. En su examen directo se expresó así:

"P—Entonces, vamos a aclarar una cosa, señor Alejandro: ¿Si usted no ha comparecido a defender el testamento hasta este momento, a pesar de que sabe que está impugnado en corte, esa no comparecencia suya no se debe a que usted no crea que es justo comparecer a defenderlo?

R—Bueno, yo todavía no tengo una opinión formada sobre ese asunto."—T.E. págs. 13–14.

Cuando en el curso de la vista celebrada el 18 de setiembre de 1970, el propio juez recurrido le preguntó si había consul-

tado con su abogado sobre el caso de impugnación de testamento, el albacea contestó que lo había consultado y que se había "llegado a la conclusión de que, hasta que se me cite, yo no puedo intervenir en el mismo, ni hemos discutido los aspectos legales." T.E. pág. 41.

En la repregunta, el albacea, único testigo de la viuda, contestó del siguiente modo:

"P—¿Es o no es cierto, testigo, que usted llamó a la oficina de este abogado y me informó que existía una demanda de nulidad de testamento?

R—Sí, señor.

P—¿Le preguntó este abogado si usted había sido demandado en el pleito?

R—Sí, señor.

P—¿Qué le dijo este abogado con relación a eso?

R—Bueno, que mientras a mí no me demandaran yo no tenía que tomar parte en el asunto o en el pleito.

P—¿Le dijo que usted defendiera, sí, el testamento extrajudicialmente haciéndolo cumplir entre los herederos?

R—¿Cómo es?

P—¿Este abogado le dijo a usted que siguiera cumpliendo con el testamento . . .

R—Oh, sí! En todas sus partes.

P—. . . en relación con los herederos?

R—Exacto.

P—¿Y con todas las personas?

R—Con todas las personas envueltas.

P—¿Usted lo ha estado cumpliendo hasta la fecha?

R—Yo creo que sí.

P—¿Y lo seguirá cumpliendo mientras sea albacea?

R—Sí, señor.

P—¿Su nombramiento como albacea, de dónde surgió?

R—Del mismo testamento.

P—Del testamento. ¿Y en el testamento, en ese mismo testamento nombra a su esposa heredera también con las otras herederas?

R—Sí, señor.

P—Es decir, ¿el testador tenía conocimiento de la existencia, de que usted era casado con su sobrina?

R—Sí, señor.

P—¿En algún momento usted ha tenido conflicto, usted tiene algún interés en la herencia?

R—Ninguno.

P—¿Como albacea usted dijo que representaba al testador?

R—Sí, señor.

P—¿Cuál es su misión en este procedimiento, en esta testamentaría, cuál es su misión?

R—Bueno, seguir el testamento de acuerdo con la voluntad del testador, y defender los intereses de todos los herederos envueltos.

P—De todos los herederos. ¿Y administrar la herencia?

R—Administrar la herencia.

P—¿Hasta pagar la contribución de herencia?

R—Sí.

P—En caso de que usted tuviera un asesoramiento legal que usted solicite, en caso que fuese demandado y se le dijera que tuviera que defender el testamento, ¿lo defendería usted?

R—Si las recomendaciones legales son esas, las llevaría adelante.

.        .        .        .        .        .        .        ·.

P—¿Usted tiene algún interés encontrado en relación con su esposa y con los herederos por el motivo de ser albacea?
Es decir, intereses encontrados en la herencia.

R—No tengo ningún interés encontrado en la herencia.

P—¿Usted tiene alguna participación en la herencia, algún interés en la herencia?

R—No tengo ninguno.

P—¿Así es que está actuando con relación y en cumplimiento con el testamento?

R—Tal como lo estipula el testamento.

P—Nada más, honorable Juez."—T.E. págs. 41–46.

No es suficiente base para concluir que el albacea, en forma definitiva e incondicional, había decidido no intervenir en el caso de la impugnación del testamento. Y menos todavía que no lo hiciera porque el no hacerlo beneficiaba a su esposa.

Previene el Art. 824(3) de nuestro Código Civil:

"Artículo 824(3).—No habiendo el testador determinado especialmente las facultades de los albaceas, tendrán las siguientes:

(1) .　　.　　.　　.　　.　　.　　.　　.

(2) .　　.　　.　　.　　.　　.　　.　　.

(3) Vigilar sobre la ejecución de todo lo demás ordenado en el testamento, y sostener, *siendo justo,* su validez en juicio y fuera de él." (Bastardillas nuestras.)

■ El Código no obliga al albacea a sostener necesariamente en todo caso, a todo trance, tal validez. Sí viene obligado a sostenerla cuando esté convencido de que ello es justo, y si entonces no lo hace, quebranta la obligación que en ese sentido le impone la Ley, siendo responsable de los daños y perjuicios que pueda irrogar con tal conducta. Empero, cuando se encuentre convencido de que no es justo sostenerla, su inacción frente a la cuestión es lo prudente y aconsejable.

Manresa comenta este problema así:

"D. *Vigilar la ejecución del testamento y sostener su validez en juicio y fuera de él.*—Esta es la facultad más importante que se concede al albacea.

El albacea no es, con arreglo a la ley, el ejecutor de todas las disposiciones testamentarias; pero sí una especie de inspector que debe vigilar por que todas se cumplan o ejecuten. Es, además, el defensor, digámoslo así, del testamento, debiendo sostener la validez de todas sus cláusulas en juicio y fuera de él, siempre, es claro, que lo crea justo. El testador declara su voluntad queriendo que sea cumplida, y como él defendería esa última voluntad si viviese, debe defenderla el albacea.

Esta doctrina, fiel expresión del número 3ro. del artículo 902, se aplica en la sentencia del Tribunal Supremo de 11 de enero de 1900.

Defiende el albacea extrajudicialmente la validez del testamento en su conjunto y en lo relativo a sus diversas cláusulas, siempre que no medie cuestión judicial en las reuniones previas con los herederos, cuando éstos duden sobre esa validez o la nieguen, asesorándose del dictamen de Letrados, proponiendo la resolución por medio de árbitros o amigables componedores, in-

terviniendo en las transacciones, etc. Pero la ley no podía imponer esa obligación en todo caso porque sería absurdo que aun convencido de la nulidad, debiera, sin embargo, obstinarse en defender la validez. Por eso la facultad y el deber sólo existen siendo justa la defensa del testamento. Para ello el albacea no puede obrar impulsado sólo por su creencia, sino que debe consultar la cuestión o cuestiones que se presenten, y una vez convencido de la razón o justicia con que obró el testador, defender su última disposición. No creemos que porque se declare judicialmente la nulidad del testamento o de algunas de sus cláusulas, quede el albacea responsable al pago de gastos, costas, perjuicios, etc., siempre que hubiese obrado de buena fe y debidamente asesorado y convencido de que era justo defender la validez. El precepto lo que quiere es que no se entienda que en todo caso, justa o injustamente, debe salir el albacea a la defensa del testamento. Ahora bien: si obra con mala fe y así se declara, la solución sería distinta." Manresa, *Código Civil Español*, Tomo VI, págs. 857–858 (7ma. ed.).

El propio tribunal de instancia a la página 2 de su Resolución, cita la parte de esos comentarios en que se dice que el albacea debe sostener la validez *"siempre que lo crea justo."*

Por otro lado, en las varias ocasiones en que el albacea se le preguntó sobre el estado mental del testador, si estaba lúcido o estaba loco, inconsciente o cómo estaba, contestó que no había estado presente al tiempo de otorgarse el testamento, que "respecto a la condición mental yo no podría dar una opinión."—T.E. pág. 37—Si esto es así ¿Qué perjuicio para los interesados de la herencia podría derivarse de su conducta de no defender el testamento a menos que se le demande judicialmente?

Es de suponerse que la persona que está en mejores condiciones para sostener la validez del testamento impugnado, lo sea la compañera de muchos años del testador, su viuda la señora Numida González Mena, no sólo por la intimidad de sus relaciones de convivencia, sino porque de ese testamento ella deriva la mayor participación hereditaria individual en el caudal relicto, por la voluntad de su finado esposo, además

de la participación legal en su cuota usufructuaria sobre los bienes de la herencia, equivalente a dos tercios de la parte española de la herencia y a una mitad de la parte puertorriqueña, más los legados especiales, hechos sobre ciertos bienes y cuentas bancarias en España, sin mencionar su parte ganancial o privativa en la masa hereditaria. Por eso, nada más natural que ella, hecha única parte demandada en el pleito, contestara prontamente la demanda, negando sus alegaciones fundamentales y exponiendo, como defensa afirmativa que "el testamento otorgado, objeto de este pleito, es válido y legal, habiéndose observado en su otorgamiento, todos los requisitos de ley, y habiendo el testador estado en condiciones de testar según requiere la ley."

Tenemos pues, que la propia prueba aportada por la viuda, demostró que el albacea, tan pronto tuvo conocimiento del pleito consultó con su abogado y éste le aconsejó que no interviniera en el pleito hasta tanto no se le notificara judicialmente del pleito, haciéndolo parte demandada, y así lo hizo "porque ésas fueron las recomendaciones de mi abogado."—T.E. pág. 13.

La motivación que el juzgador le atribuye al albacea contador partidor para no intervenir hasta que se le demandara, es decir, "porque ello beneficia a su esposa", no tiene apoyo alguno en la prueba que ante él se aportó. Jamás se demostró que él hubiera quebrantado sus obligaciones, mucho menos con motivos de egoísmo, o para beneficiar los intereses de su esposa, o de cualquier otra persona. Al nombrarle albacea y contador partidor el testador tenía pleno conocimiento de que era el esposo de su sobrina Gilda a quien también nombró albacea en caso de fallecer su esposo Alejandro.

Según se alega en la demanda de nulidad del testamento, párrafo 7, ella rehusó hacerse parte en la acción, no obstante resultar beneficiada en caso de prosperar la misma. Se la llevó al pleito como parte demandada. Consecuente con su posición, no contestó la demanda y su rebeldía fue anotada

el 29 de mayo de 1970. La transcripción de evidencia revela las gestiones familiares que realizó el albacea para evitar que las cuatro hermanas de su esposa incoaran la demanda, no obstante el beneficio que de ello pudiera recibir su esposa. (T.E. págs. 17–19.) No existe, a juicio nuestro, entre ellos, situación grave de conflicto de intereses. Puede nombrarse albacea al heredero de mayor participación, si es mayor de edad y tiene capacidad para obligarse. Art. 815, Código Civil.[6]

La abstención condicionada del albacea, previamente aconsejada por su letrado, no debió interpretarse como su firme y definitiva decisión de no participar jamás en la controversia judicial sobre la validez del testamento. Nada hay en autos que indique que su actitud de no tomar parte en ella, mientras no se le hiciera parte demandada y fuera emplazada constituyera negligencia grave, conducta dolosa, maliciosa, de mala fe o que quebrantara sus obligaciones testamentarias y legales, o que violara la confianza que en él depositó el causante al designarle ejecutor de su última voluntad, o que se hiciera indigno para obrar como tal, que como hemos visto, son las causas que la jurisprudencia y la doctrina española apuntan como motivos para la remoción.

■ Pero es que hay más. En todo pleito para anular un testamento es necesario demandar tanto al albacea como a todos los herederos y legatarios. Así lo disponían los Arts. 598 y 599 del Código de Enjuiciamiento Civil (32 L.P.R.A. secs. 2591, 2592) aún vigentes. Leen así:

"§ 2591. Acciones para determinar validez

Cuando se impugnare la validez de un testamento, por haberse dejado de cumplir algunas de las formalidades exigidas por la ley, o carecer el testador de capacidad para testar, aléguese o no la existencia de otro válido de fecha posterior o anterior, podrá

---

[6] Dispone así el Art. 815 del Código Civil (31 L.P.R.A. sec. 2512):
"No podrá ser albacea el que no tenga capacidad para obligarse. El menor no podrá serlo, ni aun con la autorización del padre o del tutor."

promoverse juicio por cualquier heredero, o por un albacea o legatario designado en el testamento cuya validez se intenta probar, al objeto de averiguar si el finado dejó testamento válido y en tal caso determinar el documento en que se halla consignada su última voluntad.

§ 2592. Dónde se promoverán; partes

Dicho juicio se promoverá en la sala del Tribunal Superior, cuya jurisdicción comprenda la última residencia del finado o el lugar en que radiquen la mayor parte de sus bienes. Se tendrá por partes en el juicio al albacea y a los herederos y legatarios del finado, nombrados en cualquier testamento que se alegue ser de dicho finado, y cuya validez se procure probar o destruir."

En el presente caso sólo se ha demandado a la viuda, y a uno de los herederos testamentarios. El pleito no podría proseguir sin la comparecencia de todos los herederos y legatarios mencionados en el escolio 1, ya que ninguna sentencia invalidando el testamento podría afectarlos sin haber tenido su día en corte. En la obra antes citada de Albaladejo, *"El Albaceazgo en el Derecho Español"* a la pág. 257 se consigna:

". . . Los albaceas deben demandar o defender si es justo. Y aunque no lo estimen así los albaceas, pueden no obstante demandar y defender los herederos. Pero para atacar el testamento, cualquier que lo haga, no puede prescindir de los albaceas y dirigirse sólo contra los herederos; puede, si quiere, dirigirse también contra éstos, pero necesariamente debe dirigirse contra aquéllos.

La utilidad práctica de que el que impugne el testamento dirija el procedimiento contra los albaceas y los herederos consiste—como advierten Roca Sastre (27 bis) y Ossorio (28)—en que la sentencia que recaiga produzca efecto incluso contra los herederos; pero no debe olvidarse, por lo menos, que en las cuestiones relativas a la validez o nulidad de las disposiciones testamentarias la presunción de cosa juzgada es eficaz contra terceros, aunque no hubiesen litigado, conforme al art. 1.253, ap. 2o. y sentencias de 10 de junio 1902 (28 bis) y 21 marzo 1911 (28 ter)."

De suerte, que puede sostenerse que la forma más eficaz que tiene el albacea para defender el testamento es no solicitar la

intervención, ya que sin su presencia en el pleito no podrá anularse el testamento.(⁷)

Procediendo la anulación de la resolución removiendo al albacea, se hace innecesario que pasemos a determinar en detalle el segundo recurso de *certiorari*, Núm. O-71-101, interpuesto contra las resoluciones de 23 y 29 de marzo de 1971. Estas denegaron la prórroga del plazo del albaceazgo solicitada el 5 del mismo mes de marzo de 1971, por el motivo de

". . . haberse dictado la resolución de 1ro. de diciembre de 1970 removiendo de su cargo al albacea."

Al iniciarse la acción de nulidad estando en vigor una prórroga de un año, en virtud de lo dispuesto en el Art. 826 de nuestro Código Civil, automáticamente se prorrogó el plazo del albaceazgo hasta un año después de la terminación de "los litigios que se promovieren sobre la validez o nulidad del testamento o de alguna de sus disposiciones."

La acción sobre nulidad empezó el 30 de abril de 1970. De modo que, después de esa fecha, se hacía innecesario solicitar del tribunal a quo prórroga alguna del plazo del albaceazgo.

Por todo lo expuesto *se dictará sentencia anulando las resoluciones recurridas objeto de ambos recursos.*

El Juez Presidente, Señor Negrón Fernández, no intervino al igual que los Jueces Asociados, Señores Hernández Matos y Rigau. El Juez Asociado, Señor Martín, concurre en el resultado.

---

(⁷) Sobre partes indispensables ver: *Fuentes* v. *Tribunal de Distrito*, 73 D.P.R. 959 (1952); 2 Barron & Holtzoff, *Federal Practice & Procedure*, sec. 512; 3A, Moore, *Federal Practice*, sec. 1907, p. 2219 (ed. 1970); R. Hernández Colón, *Manual Derecho Procesal Civil*, secs. 1104 y 1304.