Opinión disidente emitida por la
Jueza Asociada Señora Fiol Matta,
a la cual se unen el Juez Presidente Señor Hernández Denton y la Juez Asociada Señora Rodríguez Rodríguez.
La disputa entre los miembros de la Familia Vilanova es compleja y ha conllevado numerosos litigios durante más de una década. Ante nuestra átención se encuentran dos de estas controversias: (1) quiénes deben sustituir al deman- *863 dante fenecido, don Juan Adolfo Vilanova Díaz, en una ac-ción que éste instara en vida contra su hoy heredera-albacea para reivindicar sus bienes, y (2) si procede emitir cartas testamentarias a favor de esa heredera, antes de que recaiga una sentencia firme sobre la validez del testa-mento en el que se le designa albacea, para que administre el caudal hereditario del que supuestamente sustrajo bienes. (1)
La Opinión mayoritaria determina que, en el pleito de reivindicación de bienes, el causante debe ser sustituido únicamente por los herederos no demandados. Así, revoca la decisión del foro apelativo de acceder a nombrar un ad-ministrador judicial que represente a toda la comunidad hereditaria, incluyendo a la heredera-albacea-demandada, y que vele por la buena administración del caudal hasta que se resuelvan los conflictos sobre la validez del testamento. Asimismo, una mayoría del Tribunal decide que la solicitud de cartas testamentarias, que se había des-estimado sin perjuicio en lo que se resolvía el pleito de impugnación de testamento, tiene que evaluarse en el foro de instancia de acuerdo con ciertos criterios que se estable-cen en la opinión. Dichos criterios son copiados de un dic-tamen de un tribunal de Ohio, luego de un ejercicio herme-néutico que considero equivocado e innecesario.
Disiento de la manera en la que la Opinión mayoritaria resuelve ambas controversias. Por entender, además, que una narración pormenorizada de los hechos es necesaria para comprender las complejidades de este caso, los dis-cuto en detalle a continuación.
*864 I
Los protagonistas de estas controversias son los siete hijos e hijas de don Juan Adolfo Vilanova: Sonia Maritza, Ricardo Adolfo, Ivonne Catherine, Diana Gloria y Sylvia Vilanova Hernández, Diana Velia Vilanova Serrano y Annie Vilanova Román; así como su viuda, Iris Belia Serrano Cruz.(2) La historia gira alrededor de la voluntad que ex-presó don Juan Adolfo en su testamento y del caudal mi-llonario que dejó a estas ocho personas al fallecer en el 2007. Pero los sucesos que dieron pie a las controversias familiares comenzaron mucho antes de su muerte.
Cuando don Juan Adolfo otorgó su testamento, el 23 de junio de 1994, ya había experimentado quebrantos de sa-lud que podían crear dudas sobre su capacidad mental.(3) Sin embargo, no fue declarado incapaz judicialmente sino hasta ocho años después.(4)
En su testamento abierto, don Juan Adolfo destinó el tercio de legítima del caudal a sus siete hijos e hijas en *865 partes iguales; la totalidad del tercio de mejora a su hija Diana Velia Vilanova Serrano, que se pagaría en acciones de su compañía más importante, Pinturas Superior o Superior Paint Manufacturing Company, y la totalidad del tercio de libre disposición a su esposa Iris Beba Serrano Cruz, quien además recibiría su usufructo viudal.(5) En la escritura, el testador designó albacea y contadora parti-dora a Vilanova Serrano, quien sería sustituida por Serrano Cruz de ser necesario. Según el testamento, don Juan Adolfo les recomendó a sus albaceas defender el tes-tamento en todo momento, les prorrogó el plazo del alba-ceazgo por el término que durara cualquier litigio relacio-nado con la herencia y les relevó del pago de fianza.(6) También les confirió a sus albaceas amplias facultades para defender el testamento y transigir litigios relaciona-dos con el caudal; ordenó que todas las gestiones sobre el caudal las realizaran las albaceas de forma extrajudicial y sancionó cualquier petición de intervención judicial con el testamento pedida por los herederos con la pérdida de de-rechos hereditarios. (7)
Ese testamento es objeto de impugnación. Los herma-nos Vilanova Hernández y Vilanova Román alegan que el testamento fue diseñado para aumentar la porción que re- *866 cibiria Vilanova Serrano respecto al testamento anterior(8) y que don Juan Adolfo se encontraba incapacitado mental-mente para testar cuando lo hizo(9) El Tribunal de Pri-mera Instancia resolvió que don Juan Adolfo estaba capa-citado para testar. La revisión de esa determinación se encuentra ante el Tribunal de Apelaciones.
La declaración de incapacidad de don Juan Adolfo se solicitó el 1 de noviembre de 2000.(10) El 20 de marzo de 2002 se le nombró un administrador judicial provisional al testador. El foro de instancia lo declaró incapaz para regir sus bienes y su persona el 12 de diciembre de 2002 y le nombró a una procuradora de relaciones de familia como tutora provisional.(11) En su Resolución, el juez de instan-cia relató que el perito del tribunal opinó que don Juan Adolfo sufría de demencia tipo Alzheimer, complicada por lesiones vasculares cerebrales y por los efectos del abuso del alcohol.(12)
Dentro del pleito de incapacidad, los hermanos Vilanova Hernández pidieron que se le ordenara a Vilanova Serrano *867 y a Serrano Cruz que les permitieran visitar a su padre.(13) El 30 de octubre de 2001, el Tribunal ordenó que se lleva-ran a cabo relaciones paterno-filiales entre don Juan Adolfo y sus hijos mayores, y le nombró un defensor judicial hasta tanto el perito del tribunal examinara su estado físico y mental.(14) A Sonia Vilanova Hernández se le con-cedió la tutela de su padre el 27 de octubre de 2003 y la custodia física el 14 de noviembre de 2003.
Luego de la declaración de incapacidad, el 12 de diciem-bre de 2003, el Tribunal de Primera Instancia determinó que “estando incapacitado Juan Adolfo Vilanova Díaz se han transferido bienes cuantiosos de éste a nombre y para beneficio de Iris Belia Serrano Cruz y Diana Velia Vilanova Serrano y en detrimento del incapaz”.(15) En ese momento, la investigación sobre las transacciones económicas de don Juan Adolfo, ordenada por el tribunal en mayo de 2002 a instancias del administrador judicial provisional, apun-taba a que Serrano Cruz y Vilanova Serrano habían adqui-rido con el dinero del incapaz un seguro de vida de $7 mi-llones a su nombre, en el que ellas eran las únicas beneficiarías; habían hecho un contrato de anualidad variable por $4 millones, en el que también eran ellas las beneficiarías, habían depositado casi $3 millones identifi-cados como donación tipo father’s gift en una cuenta a nom-bre de Vilanova Serrano y habían transferido los fondos de las cuentas privativas de don Juan Adolfo a cuentas con-juntas con Serrano Cruz.(16) Por ello, el tribunal autorizó a *868 la tutora Sonia Vilanova Hernández a ampliar la investi-gación a transacciones realizadas desde 1994, a contratar un contador para hacer una auditoría de los estados finan-cieros de don Juan Adolfo, a contratar un perito calígrafo que analizara las firmas en contratos y cheques, y a con-tratar abogados para instar acciones judiciales con el fin de localizar y recuperar los bienes del incapaz.
El 26 de enero de 2006, don Juan Adolfo, representado por su tutora Sonia Vilanova Hernández y, a su vez, en representación de sus empresas, presentó una demanda de reivindicación de bienes contra Serrano Cruz, Vilanova Serrano y otros profesionales que contribuyeron para las transferencias de fondos. En la demanda, alegó que, según surgía de la investigación del administrador judicial, Serrano Cruz y Vilanova Serrano, con el consentimiento directo o tácito de los demás codemandados, se habían estado apropiando sistemáticamente de los bienes personales de don Juan Adolfo, aprovechándose de que estaba incapaci-tado clínicamente desde 1993. Estimó las pérdidas econó-micas causadas en $45 millones. Los demandados contes-taron y Serrano Cruz reconvino.
El 23 de noviembre de 2007, don Juan Adolfo murió. El 3 de diciembre se paralizaron los procedimientos. Debido a su fallecimiento, surgieron las dos controversias que hoy debemos resolver.
II
El 3 de diciembre de 2007, el Tribunal de Primera Ins-tancia ordenó a la Sucesión de don Juan Adolfo que reali-zara los trámites de sustitución de parte fallecida conforme a la Regla 22.1(b) de Procedimiento Civil de 2009. Dicha regla, en su parte pertinente, dispone que:
*869 (b) Si una parte fallece y la reclamación no queda por ello extinguida, cualquiera de las partes en el procedimiento o sus abogados o abogadas notificarán el fallecimiento al tribunal y a las otras partes dentro del término de treinta (30) días, con-tados desde la fecha en que se conozca tal hecho. El tribunal, a solicitud hecha dentro de los noventa (90) días siguientes a la fecha de dicha notificación, ordenará la sustitución de la parte fallecida por las partes apropiadas. Los(Las) o las causaha-bientes o representantes podrán presentar la solicitud de sus-titución del(de la) finado (a) o de la finada, y dicha solicitud se notificará a las partes en la forma dispuesta en la Regla 67 de este apéndice .... La demanda se enmendará a los únicos fines de conformar la sustitución e incorporar las nuevas partes del pleito. Transcurrido el término sin haberse solicitado la susti-tución, se dictará sentencia desestimando el pleito, sin perjuicio.(17)
Los hermanos Vilanova Hernández y Vilanova Román pidieron sustituir a su padre en el pleito para la restitución de bienes el 15 de enero de 2008. El 6 de febrero de 2008, Vilanova Serrano presentó una moción en la que se opuso a la sustitución solicitada por sus hermanos y pidió que don Juan Adolfo fuera sustituido por la Sucesión compuesta por los siete hermanos y la viuda, representada por ella como albacea. Argumentó que le correspondía a ella repre-sentar al causante como demandante, según el Artículo 584 del Código de Enjuiciamiento Civil de 1933:
Será deber de los administradores y, mientras éstos se nom-bren, de los albaceas representar al finado en todos los proce-dimientos comenzados por o contra el mismo antes de su muerte y los que se promovieran después por o contra el caudal de la herencia. Las acciones o procedimientos instruidos por o contra el finado se suspenderán a su muerte ínterin se haga cargo el albacea o se nombre administrador y el albacea *870 o administrador quedará subrogado como parte en la acción.(18)
El 21 de febrero, la jueza de instancia indicó que, “de entrada”, no tenía reparos con sustituir al causante por todos los miembros de la Sucesión, como solicitó Vilanova Serrano, pero, para hacerlo, la albacea debía acreditarle que el tribunal le había expedido las cartas testa-mentarias. Señaló que eso no eximiría a las codemandadas de comparecer en ese carácter. No obstante, hizo constar que entendía que las circunstancias que motivaron el caso de reivindicación de bienes eran distintas a las que con-templa el Código de Enjuiciamiento Civil cuando le en-carga a la albacea representar los intereses del cau-sante.(19)
El foro de instancia finalmente decidió que correspondía a la albacea testamentaria como tal, no en representación de la Sucesión, y a todos los herederos de don Juan Adolfo sustituirlo como parte demandante, pues en la sucesión testada se conoce la identidad de los herederos y éstos de-ben actuar conjuntamente con la albacea en todos los liti-gios a favor o contra el caudal hereditario. Asimismo, re-solvió que Vilanova Serrano y Serrano Cruz perman-ecerían como codemandadas en su carácter individual; su inclusión como demandantes era sólo para efectos procesa-les por ser herederas, porque sus intereses estaban en claro conflicto con los de los demás demandantes.(20)
El 6 de mayo de 2008, los hermanos Vilanova Hernán-dez y Vilanova Román acudieron al Tribunal de Apela-ciones. Alegaron que la determinación del foro de instancia perpetuaba el conflicto de intereses existente e imponía *871 una limitación al litigio, pues tendrían que obtener la apro-bación de Vilanova Serrano y Serrano Cruz para presentar alegaciones contra ellas.(21) También acudió al foro apela-tivo Vilanova Serrano, el 8 de mayo de 2008, para que se revocara la Resolución del Tribunal de Primera Instancia y se dispusiera que fuera ella la única que sustituyera al causante como demandante.!(22)
El Tribunal de Apelaciones consolidó los recursos de cer-tiorari y revocó la resolución del foro primario. Dispuso que, con el fin de salvaguardar los mejores intereses de todas las partes, debía nombrarse un administrador judicial especializado en el manejo de inversiones para que re-presentara a don Juan Adolfo como demandante. Se basó en que, con la muerte del causante, todos los integrantes de su sucesión heredaron su causa de acción; en que la validez del testamento de don Juan Adolfo se está cuestio-nando judicialmente, y en que un tribunal puede nombrar administrador del caudal a un extraño cuando las circuns-tancias lo ameriten.(23)
A este Tribunal recurrieron Vilanova Serrano y Serrano Cruz para pedir que se revocara la Sentencia del foro ape-lativo y se ordenara que la albacea sustituyera al finado de forma exclusiva; en la alternativa, que se desestimara la demanda de reivindicación de bienes. La petición indica que el Tribunal de Apelaciones erró al no aplicar la dispo-sición del Código de Enjuiciamiento Civil que establece que la albacea debe representar al causante en los procedi-mientos instados por él antes de su muerte y al sugerir que un extraño sustituyera al causante, removiendo de facto a la albacea sin una vista previa y adjudicando la validez del testamento a base de las alegaciones de la otra parte sobre *872 la incapacidad del testador antes de que fuera declarada. (24)
Los hermanos Vilanova Hernández y Vilanova Román presentaron su alegato en oposición. Solicitaron que se de-negara el certiorari de Vilanova Serrano y que se ordenara que solo ellos sustituyeran al causante; en la alternativa, que se confirmara la Sentencia del Tribunal de Apelaciones y se nombrara un administrador judicial. Alegaron que sustituir al causante con la albacea impediría que algunos miembros de la Sucesión hagan valer sus derechos heredi-tarios, al dejar el caudal en manos de quienes no se esfor-zarían por reivindicar los bienes que forman parte de éste.(25)
III
Mientras se discutía quién debía sustituir a don Juan Adolfo en el pleito de reivindicación de bienes, el 29 de febrero de 2008, Vilanova Serrano presentó una petición para que se expidieran cartas testamentarias a su nombre. (26) Las cartas testamentarias son el documento judicial mediante el cual se autoriza a un albacea a ejercer sus funciones.(27) Las mismas se solicitan al aceptar expre-samente el albaceazgo, según dispone el Artículo 597 del Código de Enjuiciamiento Civil:
*873 Todo albacea que acepte el nombramiento hecho a su favor en un testamento deberá entregar al funcionario en cuya ofi-cina se halla protocolado el testamento una aceptación del cargo por escrito, acompañada de un juramento, también por escrito, comprometiéndose a cumplir, del mejor modo que le fuere dable, sus obligaciones como albacea, sin lo cual no po-drá hacerse cargo de los bienes del finado. La sala del Tribunal de Primera Instancia de la última residencia del finado o del lugar en que radican sus bienes, mediante la presentación de una certificación del notario u otro funcionario competente, en que conste haberse archivado dicha aceptación y juramento oficial, expedirá cartas testamentarias a favor del albacea, las cuales constituirán prueba de su autoridad. Tan pronto como un administrador haya prestado su fianza y juramento oficial, el juez o tribunal que lo hubiere nombrado expedirá a su favor cartas de administración bajo su sello, en testimonio de su autoridad.(28)
El 12 de marzo, los hermanos Vilanova Hernández y Vilanova Román solicitaron intervenir en el caso ex parte sobre las cartas testamentarias, se opusieron a la expedi-ción de éstas, pidieron la descalificación de Vilanova Serrano y de Serrano Cruz como albacea y albacea sustituía, y solicitaron que se nombrara un administrador judicial de los bienes del caudal, así como un contador partidor. El juez superior que atendió la petición ordenó a Vilanova Serrano que mostrara causa por la cual no debía archivar la petición hasta tanto se dilucidaran en pleitos independien-tes todas las controversias sobre la validez del testamento. Vilanova Serrano argumentó que esa decisión se basaría en meras especulaciones y que procedía expedir las cartas testamentarias.
El 14 de agosto de 2008, el Tribunal de Primera Instan-cia decidió desestimar sin perjuicio la solicitud de cartas testamentarias hasta que se adjudicara la controversia so-bre impugnación de testamento. Indicó que la petición ex parte era incompatible con el caso de impugnación de tes-tamento que estaba pendiente ante el foro de instancia y *874 con los remedios que habían solicitado los interventores en el caso de las cartas, los cuales también deberían ser aten-didos en el otro pleito contencioso.(29)
Ese dictamen fue revocado por el Tribunal de Apelacio-nes el 24 de abril de 2009, tras la apelación presentada por Vilanova Serrano el 1 de octubre de 2008. El foro apelativo concluyó que no procedía el archivo sin perjuicio de la pe-tición de cartas testamentarias, pues, aunque la acción contenciosa de nulidad de testamento puede determinar la validez del nombramiento de la albacea, todavía no ha re-caído una sentencia sobre la eficacia del testamento, que mientras tanto se presume válido. Por ello, ordenó al tribunal de instancia atender la petición de Vilanova Serrano de forma separada y expedir las cartas testamentarias si no existía causa para denegarlas, conforme a las exigen-cias del Código de Enjuiciamiento Civil.(30)
El 9 de julio de 2009, los hermanos Vilanova Hernández y Vilanova Román presentaron un recurso de certiorari ante este Tribunal para que revocáramos al foro apelativo y mantuviéramos en suspenso la expedición de las cartas testamentarias. Alegaron que no se puede atender el asunto de las cartas testamentarias de forma indepen-diente al caso de validez del testamento, pues Vilanova Serrano utilizaría la autorización de las cartas para poner en vigor el testamento impugnado y sustituir al causante en el caso de reivindicación de bienes.(31) Por su parte, Vi-lanova Serrano presentó su oposición a la expedición del recurso, en la que argumentó que se estaba rebatiendo la presunción de capacidad del testador con meras *875 alegaciones.(32) El 15 de enero de 2010 ordenamos la con-solidación de los recursos porque ambos tratan de la misma controversia y los dimos por sometidos.(33)
IV
El albaceazgo es una institución de la sucesión testa-mentaria mediante la cual el testador nombra a una persona de confianza para que se asegure de que se cumpla su voluntad después de su muerte, que se ejecuten las dispo-siciones de su testamento y se conserven sus bienes hasta que se entreguen a quienes correspondan. (34) Vélez Torres señala que “es lógico pensar que la persona que estaría en mejores condiciones para realizar estas gestiones sería el heredero”, pero puede suceder que éste no tenga la capaci-dad para administrar, “que surjan desavenencias entre los interesados sobre la mejor forma de administrar y cumplir con lo dispuesto por el causante, o que el heredero encar-gado de la administración sea guiado por la codicia”. (35)
En la misma línea, Puig Ferriol comienza su tratado so-bre el albaceazgo exponiendo que el problema principal de esta institución del derecho sucesorio se resume en una pre-gunta: “¿Es mejor que del exacto cumplimiento de las dispo-siciones del difunto se encargue el heredero o un tercero-albacea?”(36) En el presente caso, la interrogante se complica con la combinación de la heredera y la albacea en una misma persona. La pregunta es entonces: ¿Es apropiado que *876 el exacto cumplimiento de las disposiciones del difunto quede a cargo de una heredera-albacea cuya idoneidad para el cargo se encuentra en disputa? La clave para contestar estas interrogantes la encontramos en el elemento de fidu-cia que caracteriza a la figura del albaceazgo.
No existe una incompatibilidad general entre sucesión y albaceazgo. Por eso, los herederos y legatarios pueden ser, a su vez, albaceas. Sin embargo, el desarrollo de esta fi-gura demuestra que su mayor utilidad ha sido para atem-perar los conflictos entre los llamados a heredar.(37) Gonzá-lez Tejera afirma, incluso, que los albaceas serían innecesarios si “la condición humana no fuera como es” y todo causante pudiera confiar a plenitud en sus sucesores.(38) Así, el albaceazgo se estableció como un cargo fiduciario, voluntario, personalísimo y temporal para que la persona que testaba pudiera nombrar a una persona de confianza que hiciera cumplir su última voluntad, fuera su heredero o no.(39)
El Código Civil sólo requiere que la persona designada albacea sea mayor de edad y tenga capacidad para obligarse.(40) No obstante, como observa Albaladejo, hay personas que, aunque no presentan los impedimentos que la ley dispone como causas para excluirlos de entre los que tienen capacidad para ser albaceas, suscitan dudas en cuanto a la conveniencia de que sean los llamados a ejecu-tar ciertas disposiciones testamentarias.(41) El análisis para decidir si el albacea está capacitado para ejercer el cargo debe hacerse, pues, desde el punto de vista de su posibilidad de llevar a cabo las obligaciones que contrae y *877 de las garantías que ofrece para el mejor cumplimiento de la misión encomendada. (42)
Según Miguel Royo, “en lo fundamental, el albaceazgo confiere atribuciones a la persona que lo ostenta para que, fuera del ámbito de sus personales intereses, haga valer eficazmente la voluntad respecto de un patrimonio ajeno y desarrolle una actividad normativa y decisoria frente a las personas que tienen intereses en la sucesión”.(43) Esas atri-buciones son las facultades que el testador le haya otor-gado expresamente en su testamento y que no sean contra-rias a las leyes.(44) Si el testador no las especifica, son las que el Código Civil determina: pagar los sufragios y el funeral; satisfacer los legados en metálico, con el conoci-miento y beneplácito de los herederos; tomar precauciones para preservar y custodiar los bienes, con la intervención de los herederos presentes; velar por la ejecución del testa-mento y, si es justo, defender su validez.(45) Además, tienen las facultades secundarias necesarias para ejercer las asignadas.(46) Al ejecutar dichas funciones, la persona de-signada albacea tiene que ajustarse no sólo a las instruc-ciones del testamento, sino también al principio que regula su misión: la fiducia.(47)
En González Muñiz, Ex parte, 128 D.RR. 565, 571 — 573 (1991), discutimos esa naturaleza fiduciaria del albaceazgo y, a base de la confianza que requiere este encargo, esta- *878 blecimos que el albacea contrae una obligación de hacer y debe ejecutarla con la diligencia de un buen padre de familia. Por eso, responde por desidia, mala administra-ción, dolo, apropiación indebida de los bienes, gastos inne-cesarios y litigios temerarios, entre otras razones. Asi-mismo, en Alejandro v. Tribunal Superior, 100 D.P.R. 600, 608-611 (1972), tras notar que el Código Civil menciona la remoción del albacea como una de las causas de termina-ción del albaceazgo, pero no dispone cuáles son las razones para la remoción,(48) citamos las que ha establecido la ju-risprudencia española, que incluyen la mala administra-ción del caudal, la conducta dolosa en el desempeño del cargo y el uso malicioso de sus facultades en peijuicio de los llamados a la herencia.
Puig Ferriol explica que los tribunales españoles han estimado los actos dolosos en beneficio propio como causa suficiente para remover a una persona del cargo de alba-cea, pues es “totalmente incompatible una conducta dolosa con el desempeño de un cargo eminentemente fiduciario” y una de las características fundamentales del albaceazgo es la ejecución “en interés ajeno”.(49) También identifica como causa de remoción el que el albacea, a sabiendas, no in-cluya todos los bienes del caudal al preparar su inventario, que es un deber importante del albaceazgo.(50)
Por otro lado, González Tejera señala que un albacea puede renunciar al cargo si no puede proseguir con la en-comienda sin causarle serios detrimentos a sus intereses o a los de los herederos.(51) Estas motivaciones están ligadas *879 a las condiciones que acompañan algunas de las facultades de los albaceas, relacionadas con la intervención o el con-sentimiento de los llamados a la herencia en las decisiones del albacea. Lo que Royo Martínez llama el “sistema de pesos y contrapesos” para la ejecución testamentaria pro-voca que, a falta de acuerdo entre el albacea y la mayoría de los herederos, éste tenga que desistir de tomar ciertas medidas.(52) El raciocinio detrás de esto es que, como el nombramiento de un albacea priva a los herederos o cohe-rederos de sus facultades como sucesores,(53) el ejercicio del cargo no puede peijudicarlos.(54)
Todas estas disposiciones sobre el albaceazgo responden a que el elemento crucial de esta institución es la fiducia. Por lo tanto, al autorizar el ejercicio del cargo de albacea o al resolver controversias relacionadas con su nombra-miento, debemos tener en cuenta la importancia de la con-fianza del testador en quien designa y de la disposición de esa persona para actuar en beneficio de los llamados a la herencia.
V
La figura del albaceazgo siempre ha generado discusión y hasta decisiones contradictorias.(55) De hecho, el punto sobre el albaceazgo en el que coinciden los tratadistas es-pañoles es que la regulación de esta figura en la legislación es incompleta, existen demasiadas controversias doctrina-les respecto a su ejercicio y los tribunales no han logrado armonizar las contradicciones que rodean el cargo de *880 albacea.(56) La capacidad para instar acciones judiciales en concurrencia con los herederos es una de las áreas del al-baceazgo que no está suficientemente regulada. (57)
La doctrina está dividida en cuanto a si la legitimación del albacea excluye la intervención de los herederos en los pleitos y viceversa. Albaladejo considera que la interven-ción conjunta solo se da en casos de defensa del testamento o de partición. En los demás casos, depende de si la susti-tución del causante en esa acción le corresponde a los he-rederos o al albacea.(58) Mientras, Puig Ferriol expone que cualquier demanda para impugnar el testamento o para exigir derechos sobre los bienes hereditarios debe dirigirse al albacea mientras ejerce el cargo y el albacea participará en todos los litigios referentes a la constitución, el ejercicio y la terminación de su albaceazgo. Fuera de estos supues-tos, los herederos serán los legitimados para actuar en jui-cios que afecten el caudal hereditario, porque se subrogan en la posición del causante. Añade Puig Ferriol que esto no impide que el albacea pueda intervenir en esos pleitos, ya que su participación puede ser útil para los herederos y legatarios. (59)
Puig Brutau señala que la legitimación del albacea para defender la validez del testamento en juicio, incluida entre las facultades del cargo en el Artículo 824 de nuestro Có-digo Civil, 31 L.P.R.A. see. 2521, no” implica que sólo el albacea puede representar al causante en pleitos en su nombre. Entiende que los herederos también están legiti-mados porque son partes interesadas y tienen derechos *881 que proteger.(60) El mismo razonamiento aplica cuando se analiza el Artículo 584 del Código de Enjuiciamiento Civil, supra, que impone a los albaceas o administradores el de-ber de representar al finado en los procedimientos judicia-les iniciados antes de su muerte o los relacionados con la herencia después de su fallecimiento. La disposición or-dena al albacea a intervenir, pero no exige que sea con exclusión de los causahabientes. Con relación a esta idea, en Paine v. Srio. de Hacienda, 85 D.P.R. 817, 820 (1962), este Tribunal indicó que los albaceas no forman una persona jurídica distinta de los herederos, pues “[e]l alba-ceazgo no es otra cosa que una administración acompa-ñada de un derecho de representación para cumplir ciertas funciones específicas relacionadas con la conservación del caudal hereditario”.
Como señala Puig Ferriol, la legitimación del albacea para hacer valer en juicio los derechos y las obligaciones relacionados con el testamento
... ha de configurarse como un supuesto de sustitución proce-sal, ya que el albacea es verdadera parte procesal porque de-fiende intereses que pertenecen a quien no puede hacerlos va-ler, pues el causante ya ha fallecido cuando entra en funciones el albacea y los destinatarios de los bienes hereditarios no ad-quieren ningún derecho de disposición sobre los mismos hasta tanto el albacea universal no les haya hecho entrega de los bienes o dinero de acuerdo con lo ordenado por el testador.(61)
De la misma forma, Albaladejo describe que, en la sus-titución procesal del causante por el albacea, el segundo se convierte en parte sin ser el titular de la relación litigiosa, “de forma que obra en nombre propio, pero en interés ajeno (en el presente caso de los sucesores o favorecidos por el testamento)”.(62)
*882 En el caso ante nuestra consideración, si se autoriza a Vilanova Serrano a ejercer el cargo de albacea, ésta tendría que sustituir al causante en los litigios relacionados con los bienes del caudal, pero no por ello podría impedir la inter-vención de los herederos con interés en esos pleitos. Asi-mismo, la albacea tendría que actuar, tanto al representar al causante en los procesos judiciales como al llevar a cabo las demás encomiendas del testador, con la responsabili-dad fiduciaria que caracteriza el cargo.
VI
Las cartas testamentarias se expiden para acreditar la autoridad del albacea nombrado en testamento.(63) El Có-digo de Enjuiciamiento Civil exige a toda persona que acepte el cargo de albacea comprometerse a cumplir con éste mediante un escrito juramentado, que es lo mismo que la petición de cartas testamentarias.(64) Sin embargo, el Código Civil considera aceptado el albaceazgo si la persona designada no se excusa dentro de seis días después de co-nocer de la muerte del testador o del nombramiento por testamento.(65) En Andino v. Andino, 83 D.P.R. 138, 140—141 (1961), armonizamos ambos estatutos al determinar que existen dos tipos de aceptación: la tácita, que se da con solo no renunciar al cargo, y la expresa, que se utiliza cuando la extensión y complejidad del caudal obligan al albacea a obtener la legitimación del tribunal para ejercer sus poderes. Esto quiere decir que, de ordinario, no es ne-cesario requerir la expedición de cartas testamentarias para reconocerle a un albacea sus facultades para actuar como tal. Una vez aceptado tácitamente el cargo, puede ejercer como albacea. Ahora bien, el recurso que nos ocupa no es un caso sencillo de aceptación del albaceazgo. La *883 composición del caudal que dejó don Juan Adolfo, así como la situación conflictiva entre los miembros de la familia Vilanova, dictan el requerimiento de cartas testamentarias y nos exigen expandir nuestro análisis sobre la procedencia del cargo.
En Batiz v. Tribunal Superior, 104 D.P.R. 41, 42-47 (1975), explicamos que a los procedimientos de jurisdicción voluntaria, como es el de las cartas testamentarias, suelen comparecer varias partes en defensa de intereses opuestos, tornando el caso en uno contencioso en el que se debe ad-judicar una controversia genuina. Aquí nos enfrentamos a un conflicto sobre la viabilidad de que Vilanova Serrano ejerza la posición de albacea, un cargo eminentemente fi-duciario que no sería compatible con los actos que se ale-gan en su contra. Esa controversia no se puede despachar solamente con advertir que la centralidad del recurso es la petición de cartas y que las cuestiones sobre el testamento en virtud del cual se hace el nombramiento de la albacea se atenderán en otro pleito. Erró al hacerlo el Tribunal de Apelaciones y al concluir, además, que lo único que se ha-bía presentado eran unas alegaciones sobre la falta de ca-pacidad de Vilanova Serrano para fungir como albacea, lo cual no incidía en la decisión de autorizar las cartas.
En cuanto a este punto, la opinión mayoritaria llega a una conclusión muy similar a la nuestra: debido a la natu-raleza fiduciaria del cargo de albacea, en un proceso de expedición de cartas testamentarias en el que se presente una oposición por cuestionarse la idoneidad de la persona nombrada albacea, deben considerarse factores como el grado de conflicto de intereses de la albacea y la descon-fianza entre las partes. Eso fue lo que consideró también el Tribunal de Primera Instancia en este caso, al desestimar sin perjuicio y al negarse a acreditar la autoridad de la albacea en el momento cuando lo solicitó y dejar abierta la posibilidad de que la solicitud se volviera a presentar y a *884 considerar en los méritos. Sin embargo, la opinión mayori-taria confirma la determinación del Tribunal de Apelacio-nes de revocar la decisión del foro de instancia y ordenarle atender de forma separada la petición de las cartas testamentarias.
Se debe dar espacio para que la sala que tiene ante sí la controversia pueda disponer sobre la validez del testa-mento y la solicitud de descalificación de la albacea. No se puede ignorar que ese pleito está pendiente y consentir que la albacea ejerza sus facultades, con la posible consecuen-cia de que lo haga sin autorización y en perjuicio de los derechos de las demás personas coherederas. Tomando en cuenta que ya se presentó prueba sobre la idoneidad de la albacea en la sala donde se atendió la demanda sobre im-pugnación de testamento y descalificación de albacea —que se encuentra en etapa de apelación — , devolver el caso de cartas testamentarias al foro de instancia para que evalúe la misma prueba duplicaría y alargaría el proceso. No apoyo la devolución de este caso al foro de instancia, como dispone la opinión mayoritaria, por entender que ello no abonaría a la economía procesal en un caso que se está litigando hace más de una década.
Por otro lado, la Opinión mayoritaria, al confirmar la Sentencia del Tribunal de Apelaciones en el caso sobre car-tas testamentarias, hace la salvedad de que la petición se deberá examinar no sólo a tenor con los requisitos de com-petencia del Código de Enjuiciamiento Civil de Puerto Rico, sino también utilizando tres factores relacionados con la idoneidad para ejercer el cargo fiduciario. Dichos facto-res no son más que una traducción al español de la doc-trina discutida en un caso de un tribunal apelativo de Ohio que interpreta una ley de ese estado.(66)
*885 El método empleado en la Opinión mayoritaria es total-mente inadecuado. No hay necesidad de recurrir al derecho estatutario y a la jurisprudencia de dos jurisdicciones de Estados Unidos —Louisiana y Ohio— para determinar que hay un elemento fiduciario en nuestra institución de alba-ceazgo y establecer los criterios que deben guiar a nuestros tribunales al analizarlo.(67) El que nuestro derecho de su-cesiones se haya visto influenciado por doctrinas estado-unidenses, principalmente a través de las disposiciones del Código de Enjuiciamiento Civil, no justifica que se adopten como propias las legislaciones de otras jurisdicciones que no necesariamente comparten los principios de nuestro ordenamiento. No debemos perder de perspectiva que el executor angloamericano es diferente al albacea del Dere-cho Civil y que esa diferencia incide necesariamente en las reglas sustantivas y procesales que rigen ambas instituciones. (68)
Además, en derecho comparado, no es correcto recurrir a las soluciones adoptadas por los entes legislativos en otras jurisdicciones para interpretar las leyes nuestras. No puede convertirse en práctica acudir a los estatutos de unos estados, como se hace en la Opinión mayoritaria, sin explicar por qué se escogen esas disposiciones y no las de otros estados o las de otros países. Recurrir a las interpre-taciones sobre esas leyes, ya sean doctrinales o jurispruden-ciales, podría ser de utilidad siempre y cuando se esta-blezca previamente la similitud entre el texto foráneo *886 interpretado y el propio. Esa semejanza debe incluir no sólo las palabras de aquella ley, sino también su historial y propósito.(69) Solamente si hay una verdadera analogía en-tre el producto legislativo de una jurisdicción distinta a la nuestra y la que nuestra Legislatura adoptó, se justifica buscar ilustración en las interpretaciones y aplicaciones del texto foráneo.(70) Cabe recalcar que este ejercicio se uti-liza para ayudar en la interpretación de la legislación pro-pia, nunca para acoger por jurisprudencia las disposiciones de otra jurisdicción.
Ciertamente, el artículo sobre expedición de cartas tes-tamentarias de nuestro Código de Enjuiciamiento Civil no proviene de España. Pero, nuestra doctrina sobre el alba-ceazgo y otros asuntos procesales relacionados con ese cargo han utilizado el ordenamiento español como modelo. Por ello, no se debe descartar el derecho español y estudiar esa disposición de Puerto Rico únicamente a la luz de las normas adoptadas en las jurisdicciones anglo-americanas.(71) El estudio fragmentado de una disposición legal que es parte de un conjunto de leyes que regula toda un área de relaciones económicas e interpersonales siem- *887 pre va a acarrear el riesgo de producir resultados inconsistentes. (72)
Ahora bien, al analizar nuestra doctrina de albaceazgo de origen español, así como la figura parecida del executor en el derecho angloamericano, podemos concluir que los conflictos de interés que tenga el albacea afectan su des-empeño; por eso deben considerarse antes de expedir las cartas testamentarias. Entonces, dado que el Código de Enjuiciamiento Civil permite que, una vez se expidan las cartas testamentarias, la albacea se haga cargo de los bie-nes del finado y ejerza sus funciones, me parece apropiada la decisión del foro de instancia de desestimar sin perjuicio la solicitud de las cartas hasta tanto se resuelva el pleito sobre la validez del testamento y la idoneidad de la albacea.
VII
La administración judicial se instituye para proteger a todos aquellos que puedan tener un interés legítimo en el caudal y se realiza “sin preferir unos intereses en detri-mento de los demás”. (73) Según Cuevas Segarra, la admi-nistración de la herencia cobra importancia en la práctica cuando se hace necesario manejar adecuadamente el caudal hereditario para proteger los intereses de los llamados a suceder antes de la partición. (74) El propósito de nombrar un administrador o una administradora judicial de los bie-nes del causante es conservarlos para que puedan distri-buirse más tarde entre las personas con derecho a *888 recibirlos.(75) La decisión de hacer dicho nombramiento de-pende de los hechos del caso y puede ser ordenada por el tribunal(76) o solicitada por el albacea testamentario, por cualquier heredero o legatario, o por los acreedores del finado.(77)
El Código de Enjuiciamiento Civil, en su Artículo 558, dispone que se tiene que nombrar un administrador o una administradora judicial cuando algunos de los herederos estén ausentes, sean menores o sean incapacitados y no tengan representantes(78) Hemos señalado que esta sec-ción especifica las circunstancias en las que es necesario el nombramiento, mas no excluye la administración judicial en cualquier otra instancia.(79) Por lo tanto, en una situa-ción como la presente, en la cual se busca proteger el caudal en lo que se dilucida la validez del testamento, se puede decretar la administración judicial.(80)
Debemos mencionar que el Artículo 557 del mismo Có-digo establece que, si el testador veda expresamente la ad-ministración judicial sobre sus bienes y nombra albaceas o contadores partidores para que realicen la división, no se puede nombrar un administrador. La cláusula vigésimo primera del Testamento de don Juan Adolfo prohíbe “abso-lutamente toda intervención legal y judicial en su Testa-mentaría” y ordena que la administración del caudal re-licto se practique extrajudicialmente en su totalidad.(81) Asimismo, en la decimosexta cláusula se designa a Vila-nova Serrano albacea y contadora partidora; o sea, se nom- *889 bra a la albacea y se le encomienda la división de los bienes. Aunque no está ante nuestra consideración la vali-dez de las disposiciones del Testamento, es menester seña-lar que el Artículo 1010 del Código Civil dispone que la facultad de hacer la partición se le puede encomendar a cualquier persona que no sea uno de los coherederos, como lo es Vilanova Serrano.(82) Además, un testador no puede prohibir toda intervención judicial con su testamento.(83) Las cláusulas in terrorem, dirigidas a intimidar a los here-deros para que no ataquen el testamento con fundamentos de nulidad, suelen tenerse por no puestas.(84) Ello implica que las disposiciones testamentarias que servirían como base para aplicar el artículo que imposibilita la adminis-tración judicial podrían declararse inválidas.
Más aún, debido a que, en este caso, la administración judicial se utiliza precisamente para preservar los bienes del caudal mientras se determina la validez del testa-mento, renunciar a este mecanismo porque ese testamento lo rechaza significaría dejar de velar por los intereses de todos los llamados a la herencia. No podemos abstraemos de la realidad y ampararnos en presunciones de legitimi-dad para autorizar que se expidan cartas testamentarias y que se sustituya al causante por la albacea,(85) a sabiendas de que la validez del testamento se está dilucidando en un foro inferior y de que se ha estado llevando a cabo una investigación sobre los bienes del caudal al haberse impu-tado a Serrano Cruz y a Vilanova Serrano el transferir bienes cuantiosos del causante siendo él incapaz. Nada im- *890 pide tomar conocimiento judicial sobre los casos relaciona-dos con el recurso presentado ante este Tribunal, como lo han solicitado ambos grupos de peticionarios, para proveer los remedios más adecuados en protección de los derechos de todas las partes.
En Ab Intestato Balzac Vélez, 109 D.P.R. 670, 679 (1980), expresamos que la administración judicial es el me-canismo apropiado para atender escenarios en los que se hacen alegaciones sobre actos que ponen en peligro los bie-nes del caudal. De manera similar, en Martínez et al. v. Martínez, 26 D.P.R. 157, 158-159 (1918), indicamos que es conveniente nombrar un administrador judicial en un caso en el que está en disputa si la posesión de ciertos bienes por un heredero conlleva la violación de los derechos de otros herederos.
Asimismo, en Silva Oliveras v. Durán Rodríguez, 119 D.P.R. 254, 261-264 (1987), caso sobre dilapidación de bie-nes, resolvimos que, mientras se resolvía la controversia sobre la capacidad mental de la dueña de los bienes y la validez de un poder general otorgado por ella, la manera más efectiva de proteger el patrimonio era designando un administrador judicial. En ese caso, enunciamos que preci-samente para ese tipo de situaciones es que existen estos remedios provisionales en nuestro ordenamiento procesal.(86) Además, en Planellas v. Pastrana, 63 D.P.R. 285, 290 (1944), decidimos que, ante el conflicto de intere-ses entre los sucesores —que debía ser dirimido en un caso pendiente en el foro de instancia, en el que se solicitaba que se decretara la nulidad de la declaratoria de herede-ros — , procedía la administración judicial de los bienes in-volucrados en la controversia para conservarlos y entregar-los a quien finalmente demostrara en la acción plenaria su derecho a heredarlos.
En el presente caso, están pendientes de resolución una acción de reivindicación de bienes del caudal que supues- *891 tamente se apropiaron unas herederas en detrimento de los demás herederos, así como un pleito independiente so-bre la validez del testamento en el que esos bienes se dis-tribuyen y en el que se encarga su manejo a una de las herederas. Las circunstancias son propicias para decretar la administración judicial.
Además, en marzo de 2008, los hermanos Vilanova Her-nández y Vilanova Román solicitaron ante el Tribunal de Primera Instancia que se nombrara un administrador judicial para velar por los bienes del caudal. Incluyeron esa petición en su moción en oposición a la expedición de car-tas testamentarias y solicitud de descalificación de albacea. La solicitud de administración judicial se funda-mentó en los resultados de la investigación sobre la dilapi-dación de los bienes del causante por parte de Vilanova Serrano y Serrano Cruz, en el pleito pendiente de reivindi-cación de bienes y en el conflicto de intereses entre los dos grupos de herederos. Los peticionarios señalaron que la administración judicial procedía y resultaba necesaria e indicaron los trámites en los que podría intervenir el ad-ministrador, sin que su gestión se limitara a ellos. La soli-citud cumplió con los cinco requisitos de contenido que es-tablece el Artículo 556 del Código de Enjuiciamiento Civil: (1) consignó el hecho de la muerte del causante; (2) explicó las circunstancias relativas a su último testamento; (3) jus-tificó el interés de los peticionarios en la administración y su derecho a solicitarla por ser herederos forzosos del fi-nado; (4) enumeró los nombres y las direcciones de todas las personas con derecho a la sucesión, y (5) mencionó que el causante dejó bienes sujetos a partición y su cuantía. (87) La única exigencia con la que no cumplió fue que la peti-ción estuviera juramentada. Sin embargo, en Ab Intestato *892 Balzac Vélez señalamos que, “[c]omo foro de última instan-cia, hemos estado siempre alertas de no privar a un here-dero de su derecho a pedir la administración judicial, por sutilezas técnicas como la falta de juramento de una peti-ción”, por lo que ese detalle no es impedimento para concederla. (88)
Asimismo, en la solicitud de remedio de su alegato ante este Tribunal, en abril de 2009, los hermanos Vilanova Hernández y Vilanova Román pidieron nuevamente que se nombrara un administrador judicial, como medida caute-lar válida para proteger los bienes del caudal y los dere-chos de todas las partes, en caso de que no se les permi-tiera ser los únicos sustitutos del causante como demandantes en el pleito de reivindicación de bienes.(89) Si las circunstancias del caso lo ameritan y del expediente surge que los requisitos de la solicitud de administración judicial están presentes, el hecho de que los herederos no hayan seguido estrictamente el proceso establecido por el Código de Enjuiciamiento Civil para solicitarlo no veda el que este Tribunal pueda acceder a su petición.
De otro lado, la existencia de una albacea testamentaria no impide que se nombre un administrador judicial. En Ab *893 Intestato Marini Pabón, 107 D.P.R. 433, 438-439 (1978), el Tribunal decidió que no procedía la administración, no por el mero hecho de que hubiera un albacea, sino porque pon-deró las actuaciones de éste y concluyó que había desem-peñado el cargo con la corrección y el cuidado que la ley exige.(90) A diferencia de aquel caso, en que se determinó que el albacea estaba cumpliendo con sus funciones “con toda normalidad”,(91) en el recurso que atendemos es evi-dente la controversia en torno a la legitimidad de la alba-cea designada para ejercer ese cargo. Por eso, no se en-cuentra presente el fundamento por el cual la presencia de un albacea hace innecesaria la administración judicial. Todo lo contrario; considerada la historia de la Sucesión de don Juan Adolfo, es ineludible el auxilio de una persona neutral que vele por la conservación de los bienes, la co-rrección de los procesos y los intereses de todos los herede-ros y las herederas.
Por las mismas razones, es lógico que la persona que se designe como administradora tiene que ser “un extraño de reconocida honradez y capacidad”, como ordena el Artículo 564 del Código de Enjuiciamiento Civil para casos en que no se pueda nombrar al cónyuge sobreviviente o a la persona con mayor interés en la herencia por falta de capaci-dad para el cargo u objeciones a que lo desempeñen.(92) El nombramiento de la viuda Serrano Cruz o de la heredera Vilanova Serrano como administradoras derrotaría el pro- *894 pósito de zanjar el conflicto de intereses entre los miem-bros de la Sucesión a través de la administración judicial.
El administrador o la administradora tiene la función de “dirigir y proteger los intereses de la totalidad de la herencia”.(93) La persona administradora debe tomar pose-sión inmediata de los bienes del finado, entregarlos a un depositario para su resguardo.(94) inventariarlos.(95) conser-varlos y procurar que den las rentas o los productos que correspondan.(96) Como parte de sus tareas, la persona en quien recaiga la administración judicial tendrá el deber de localizar y recuperar cualquier bien del caudal que no esté a su alcance, pero que tenga razones para pensar que existe.(97) Para ello, puede utilizar los procesos judiciales que estime razonables, incluyendo representar al finado en los pleitos comenzados por él antes de su muerte.(98) Hemos manifestado que, cuando se sospecha que se ocultaron bie-nes o cuentas que pertenecen al caudal, procede ordenar al administrador judicial que instituya procedimientos contra el heredero o la heredera que realizaba las transacciones del causante en sus últimos años de vida o contra quien proceda para que rinda cuentas.(99) Por lo tanto, en este caso hubiera sido conveniente nombrar un administrador judicial que sustituyera a don Juan Adolfo en el pleito de reivindicación de bienes con el fin de formar el caudal com-pleto, en beneficio de todos los llamados a la herencia.
*895 VIII
El procedimiento de sustitución de parte, regulado por la Regla 22.1 de Procedimiento Civil, 32 L.P.R.A. Ap. V, tiene el propósito de que, ante el fallecimiento de una parte que no suponga el fin del caso, la causa de acción pueda continuar a favor o contra las personas realmente intere-sadas en el pleito.(100) Este mecanismo procesal atiende “al interés público de que los asuntos en los tribunales se so-lucionan de forma expedita, evitando el perjuicio que la dilación pueda causar a las partes”.(101)
No queda a la discreción de los tribunales conceder la sustitución, pero para ello se requiere la notificación de la muerte de la persona que ya está en el pleito y la solicitud de sustitución por sus causahabientes o representantes.(102) En este caso, los miembros de la Sucesión notificaron sobre la muerte de don Juan Adolfo y pidieron, a tiempo, susti-tuir al causante como parte demandante. No obstante, no fue posible autorizar la sustitución dados los conflictos en-tre los herederos y las herederas, y las solicitudes opuestas de incluir o excluir del pleito a ciertos sucesores. Esta si-tuación ha prolongado el litigio y ha provocado su estancamiento.
Ante la inmovilización que representa esta controver-sia, un administrador o una administradora judicial desig-nada por el tribunal podría retomar el pleito instado por don Juan Adolfo, evitando mayores dilaciones. Debemos recordar que, cuando se realiza la sustitución, la causa de acción queda inalterada; lo único que cambia es el nombre de la parte y ésta ocupa el mismo lugar de quien sustituyó.(103) No sería efectivo sustituir al demandante so- *896 lamente por Vilanova Serrano y Serrano Cruz, personas contra quienes pesan la mayor parte de las alegaciones de mal uso de los bienes en el caso. Tampoco sería conve-niente excluirlas como sucesoras del causante, pues se po-drían violar sus derechos como herederas.(104) La sustitu-ción de don Juan Adolfo por el administrador o la administradora judicial no afectaría los derechos sustanti-vos de las partes.(105)
Entendemos que decretar la administración judicial, además de ser una determinación avalada por el ordena-miento legal, sería la más sensata. Tanto los hermanos Vi-lanova Hernández y Vilanova Román como las señoras Vi-lanova Serrano y Serrano Cruz, nos expusieron en sus alegatos lo difícil, y hasta absurdo, que sería pretender que personas con intereses totalmente contrarios litiguen juntas como codemandantes o que la albacea asuma dos per-sonalidades antagónicas, teniendo que probar las alegacio-nes de la demanda contra sí misma. Coincidimos con la Opinión mayoritaria en que las demandadas no pueden ser también las demandantes de modo directo. Mas ninguna opción en la que una o más de las partes en controversia tomen control del caso sería justa para velar por los inte-reses de todas las partes, ni eficaz para lograr determinar los derechos sobre el caudal que corresponden a quienes acudieron a los tribunales. Y es que, como dijimos en Jiménez v. Cruz, 33 D.P.R. 228, 234 (1924), “de seguir como hasta ahora, se consumirán dichos bienes en gastos judi-ciales y continuarán siendo motivo de separación y encono en vez de fuente de bienestar”. Los procesos judiciales tie-nen que servir para encontrar soluciones, no para acrecen-tar los conflictos entre las partes y alargar el camino hacia *897 su conclusión. Con el nombramiento de un administrador o una administradora judicial, se encauzarían los procesos hacia una resolución más rápida y razonable, a la vez que se permitiría que todos los miembros de la Sucesión estu-vieran igualmente representados como demandantes, en sustitución del causante.
Entiendo que el Tribunal de Apelaciones no erró al or-denar que un extraño sustituyera al causante en represen-tación de todos los herederos y las herederas. Su orden no entrañó una negación a aplicar el Código de Enjuicia-miento Civil que, como vimos, no exige la sustitución ex-clusiva del causante por la albacea. Esas disposiciones no pueden aplicarse mecánicamente en casos que encierran conflictos entre la albacea y los interesados en el caudal, como el presente. Al ordenar la administración judicial, el foro apelativo tampoco determinó la validez del testamento ni removió de facto a la albacea de su cargo, pues esas controversias serán adjudicadas en el pleito pendiente so-bre nulidad de testamento.
IX
Por los fundamentos antes expuestos, confirmaría la Sentencia del Tribunal de Apelaciones en el Caso Núm. CC-2009-0303 y devolvería el caso al foro de instancia para la continuación de los procedimientos. Ordenaría que, en el epígrafe del caso sobre reivindicación de bienes, la parte demandante fuera sustituida por el administrador judicial designado, en representación de la Sucesión de Juan Adolfo Vilanova Díaz y en representación de la participa-ción de Vilanova Díaz en las corporaciones en las que tenía intereses económicos.
En el Caso Núm. CC-2009-0591, revocaría al foro ape-lativo y desestimaría sin perjuicio la solicitud de expedi-ción de cartas testamentarias a favor de Vilanova Serrano. Esta se podría presentar nuevamente de determinarse por *898 sentencia firme que el testamento mediante el cual se le nombró albacea es válido.
Como la opinión mayoritaria resuelve lo contrario, disiento.

 Actualmente, además de los dos recursos de certiorari ante el Tribunal Supremo, que fueron consolidados y se atienden en esta opinión, está pendiente en el Tribunal de Apelaciones el caso KLAN201101211 (Caso K AC2008-0372 en el Tribunal de Primera Instancia), en el que los hermanos Vilanova Hernández y Vilanova Román impugnan el testamento de don Juan Adolfo.

 Los cinco hermanos y hermanas Vilanova Hernández son hijos de don Juan Adolfo con su primera esposa, Gloria Hernández Moloney, de quien se divorció en abril de 1966. En 1961, estando casado con Hernández Moloney, don Juan Adolfo procreó a Diana Velia junto a la señora Serrano Cruz, con quien se casó luego, bajo el régimen de sociedad de gananciales, en marzo de 1972; se divorciaron en enero de 1985 y se volvieron a casar en septiembre de 1992 bajo el régimen de capitulaciones, en el que establecieron la total separación de bienes. La hermana menor, Annie, es fruto de la relación de don Juan Adolfo con la señora Ana Román Crespo en 1979, vigente su primer matrimonio con Serrano Cruz. Por otro lado, Ricardo Adolfo Vila-nova Hernández falleció en abril de 2010, por lo que autorizamos que fuera susti-tuido por sus herederos: Ricardo Javier y Adolfo José Vilanova Fraticelli, Abimelec Vilanova Ocasio y Elizabeth González León. Véase Regla 42 del Reglamento del Tribunal Supremo, 4 L.P.R.A. Ap. XXI-A.

 Don Juan Adolfo tenía 75 años de edad cuando otorgó el testamento. Según sus expedientes médicos, presentaba síntomas de demencia desde 1993 y alucinaba debido a su problema de alcoholismo.

 En el testamento se consignó que el notario y los testigos instrumentales tenían la impresión de que don Juan Adolfo gozaba de plena capacidad mental, así como que el testador declaró que la tenía y que un doctor y un psicólogo lo habían corroborado. Véase Testamento abierto de Juan Adolfo Vilanova Díaz, Escritura Nú-mero 30 otorgada ante el notario Eduardo R. Guzmán Valiente el 23 de junio de 1994 (Testamento de 1994). Antes de la declaración judicial de enajenación mental, no es necesario que los doctores que evalúan la capacidad comparezcan al otorgamiento. Véanse los Artículos 612 a 615 del Código Civil de Puerto Rico, 31 L.P.R.A. sees. 2112-2115.

 Si Serrano Cruz le premoría, el tercio libre pasaría a Vilanova Serrano. Se crearon dos fideicomisos para casos en que ellas no pudieran manejar el dinero. El Fideicomiso Vilanova Serrano se creó en agosto de 2001 y el Fideicomiso Serrano Cruz en enero de 2002; ambos benefician a los dos hijos menores de edad de Vilanova Serrano.

 Además de las facultades conferidas por la ley, el testador concedió a sus albaceas las potestades siguientes: tomar posesión de todos sus bienes inmediata-mente que él muriera y administrarlos, realizar actos de dominio sobre bienes mue-bles e inmuebles, pagar sus deudas y cobrar sus créditos, retirar fondos depositados en instituciones financieras, firmar cheques y documentos negociables, realizar toda clase de operaciones bancarias, hacer negocios en las entidades de las que era accio-nista o socio, traspasar sus acciones a nombre de la albacea y cobrar los dividendos, suscribir toda clase de documentos y hacer las modificaciones que creyeran oportunas. Véase Testamento de 1994.

 Asimismo, prohibió la colación de las donaciones; estableció que debían res-petarse como válidas todas las disposiciones testamentarias referentes a las acciones corporativas de Pinturas Superior y señaló que esas instrucciones no tenían el obje-tivo de privar a ningún heredero de lo que le correspondía. íd.

 No era la primera vez que don Juan Adolfo enmendaba su declaración de última voluntad. Antes del Testamento de 1994, había otorgado otros tres testamen-tos abiertos en 1990, 1991 y 1992.

 Véase Demanda de Impugnación de Testamento y Descalificación de Albacea presentada en el Tribunal de Primera Instancia de San Juan el 18 de marzo de 2008, Caso K AC2008-0372. Alegan que Serrano Cruz y Vilanova Serrano mantenían a don Juan Adolfo aislado y sedado con altas dosis de medicamentos, no permitían que los hermanos lo vieran y lo engañaron para que otorgara el testamento.

 Esta solicitud de declaración de incapacidad fue presentada por Ana Román Crespo, en representación de su hija menor de edad Annie Vilanova Román, dentro de un pleito de reclamación de alimentos en el Tribunal de Primera Instancia de Bayamón. Los hermanos Vilanova Hernández intervinieron, en febrero de 2001, para oponerse a que se designara tutora de don Juan Adolfo a Serrano Cruz o a Vilanova Serrano. Posteriormente, el 22 de noviembre de 2001, Serrano Cruz también pidió que se declarara incapaz a su esposo en el Tribunal de Primera Instancia de San Juan, y todos los hermanos solicitaron intervenir.

 Resolución del Tribunal de Primera Instancia de Bayamón, D AL 1998-0270, 12 de diciembre de 2002.

 Las partes del presente pleito estipularon la incapacidad a octubre de 2002. A octubre de 2002, don Juan Adolfo se encontraba en una etapa en que tenía proble-mas de memoria, orientación y locomoción, a la que se llega luego de cuatro a seis años de enfermedad.

 Los hermanos Vilanova Hernández alegan que Serrano Cruz y Vilanova Serrano aprovecharon la incapacidad de don Juan Adolfo para tomar el control ge-rencial de las empresas Vilanova. En 1994, Vilanova Serrano obtuvo la presidencia de Pinturas Superior y despidió a Ricardo Vilanova Hernández.

 Resolución del Tribunal de Primera Instancia de Bayamón, D AL 1998-0270, 30 de octubre de 2001.

 Resolución del Tribunal de Primera Instancia de Bayamón, D EX2002-0080, 12 de diciembre de 2003. Caso Núm. CC-2009-0303, Pieza 2, Apéndice, pág. 599.

 Estas transacciones ocurrieron entre 1997 y 2002. Las más importantes se dieron entre el 6 de noviembre de 2000 y junio de 2001 mientras estaba pendiente el *868 pleito sobre incapacidad. El juez de instancia señaló que la “incapacidad verdadera” de don Juan Adolfo había comenzado años antes de que se solicitara la declaración judicial de incapacidad el 1 de noviembre de 2000.

 Regla 22.1(b) de Procedimiento Civil de 2009 (32 L.P.R.A. Ap. V). Según las Reglas de Procedimiento Civil de 1979, el término para solicitar la sustitución era de seis meses y su transcurso no implicaba la desestimación sin perjuicio, sino el sobre-seimiento en cuanto a la parte fallecida. Regla 22.1(a) de Procedimiento Civil de 1979 (32 L.P.R.A. Ap. III). No obstante, para fines de la controversia ante este Tribunal, la aplicación de una u otra versión de la regla no tiene el efecto de llevar a una resolución diferente.

 32 L.P.R.A. sec. 2471. En Mercado v. Mercado, 66 D.P.R. 811, 815 (1947), advertimos que los términos “administrador” y “albacea” suelen usarse indistinta-mente en estas disposiciones y en las españolas del mismo tema.

 Orden del Tribunal de Primera Instancia de San Juan, K AC2006-0491, 21 de febrero de 2008.

 Resolución del Tribunal de Primera Instancia de San Juan, K AC2006-0491, 3 de abril de 2008.

 Caso KLCE200800619.

 Caso KLCE200800631.

 Vilanova Díaz v. Vilanova Serrano, Sentencia del Tribunal de Apelaciones, KLCE200800619, KLCE200800631 y KLCE200800636, 10 de octubre de 2008.

 Petición de certiorari ante el Tribunal Supremo, CC-2009-303,13 de abril de 2009.

 Alegato en oposición ante el Tribunal Supremo, Caso Núm. CC-2009-303, 27 de abril de 2009. Pidieron que fueran ellos los sustitutos del causante porque conlle-varía menos gastos para el caudal, pero indicaron que, de no ser así, favorecían al administrador judicial como medida cautelar válida para proteger los derechos de las partes.

 La petición juramentada fue presentada ante el Tribunal de Primera Ins-tancia de San Juan, Caso KJV 2008-0528. Recordemos que el foro de instancia había condicionado la inclusión de todos los miembros de la Sucesión representados por la albacea, en sustitución del causante, a que Vilanova Serrano acreditara que se ha-bían expedido las cartas testamentarias a su favor.

 Véanse: I. Rivera García, Diccionario de Términos Jurídicos, 3ra ed., San Juan, Ed. LexisNexis, 2000, pág. 34; G. Velázquez, Teoría del Derecho Sucesorio Puertorriqueño, 2da ed., San Juan, Ed. Equity, 1968, pág. 259.

 32 L.P.R.A. sec. 2571.

 Resolución del Tribunal de Primera Instancia de San Juan, K JV2008-0528, 14 de agosto de 2008.

 Vilanova Serrano, Ex parte, Sentencia del Tribunal de Apelaciones, KLAN0801547, 24 de abril de 2009. Caso Núm. CC-2009-0591.

 Recurso de certiorari, ante el Tribunal Supremo, 9 de julio de 2009, Caso Núm. CC-2009-0591.

 Memorando en oposición a la expedición del auto, ante el Tribunal Supremo, 21 de julio de 2009, Caso Núm. CC-2009-0591.

 Resolución del Tribunal Supremo de 15 de enero de 2010, Caso Núm. CC-2009-0303, Pieza 4.

 E. González Tejera, Derecho de Sucesiones. Tomo II: la sucesión testamenta-ria, San Juan, Ed. UPR, 2002, págs. 535-537.

 J.R. Vélez Torres, Curso de Derecho Civil: derecho de sucesiones, 2da ed. rev., San Juan, Revista Jurídica de la Universidad Interamericana, 1992, T. IV, Vol. III, pág. 337.

 L. Puig Ferriol, El albaceazgo, Barcelona, Ed. Bosch, 1967, pág. 11.

 González Tejera, op. cit, págs. 536-539.

 Id., pág. 537. Véase, también, J. Santos Briz y otros, Tratado de Derecho Civil, Barcelona, Ed. Bosch, 2003, T. VI, pág. 381.

 M. Royo Martínez, Derecho Sucesorio, Sevilla, Ed. Edelce, 1951, pág. 315.

 Art. 815 del Código Civil, 31 L.P.R.A. sec. 2512; Alejandro v. Tribunal Superior, 100 D.P.R. 600, 617 (1972).

 M. Albaladejo, El albaceazgo en el derecho español, Madrid, Ed. Tecnos, 1969, págs. 201-202.

 íd., pág. 219.

 (Énfasis suplido.) Royo Martínez, op. cit, pág. 315.

 Art. 823 del Código Civil, 31 L.P.R.A. sec. 2520.

 Art. 824 del Código Civil, 31 L.P.R.A. sec. 2521.

 Pino Development Corp. v. Registrador, 133 D.P.R. 373, 390 (1993).

 Véase J.L. Lacruz Berdejo y F. de A. Sancho Rebullida, Derecho de Sucesio-nes, 2da ed., Barcelona, Librería Bosch, 1976, Vol. I, pág. 498. Puig Ferriol menciona como ejemplo que la facultad de custodiar los bienes hereditarios está en consonan-cia con el carácter fiduciario del albaceazgo, pues permite que la persona de con-fianza vele por que los herederos no oculten los bienes en detrimento de otros herederos. Puig Ferriol, op. cit., págs. 148-149. También indica que el poder de dis-poner de bienes hereditarios está predicado en la fiducia, porque el albacea debe asegurarse de que el producto de la venta pasará a manos de los herederos. Id., pág. 205. Véase, también, L. Diez-Picazo y A. Gullón, Sistema de Derecho Civil, 7ma ed., Madrid, Ed. Tecnos, 1997, Vol. IV, págs. 444-445.

 Art. 832 del Código Civil, 31 L.P.R.A. sec. 2529.

 Puig Ferriol, op. cit., pág. 257. Véase, también, E. Bárcenas Simarro, Par-ticiones hereditarias extrajudiciales, testamentarias y abintestatos, y formularios so-bre herencias, Madrid, Farena Gráfica, 1978, T. I, pág. 72.

 pu¡g Ferriol, op. cit., págs. 202-203. El deber de inventariar en Puerto Rico está regulado en los Artículos 568-570 del Código de Enjuiciamiento Civil, 32 L.P.R.A. secs. 2401-2403.

 González Tejera, op. cit., págs. 549. También indica que, en muchas juris-dicciones angloamericanas, se considera que la persistencia de relaciones tensas con los herederos es justa causa para la renuncia. Id.,
*879 pág. 597 esc. 257.

 Royo Martínez, op. cit., pág. 313; Lacruz Berdejo, op. cit., pág. 497.

 Albaladejo, op. cit, pág. 25.

 J.J. Gómez Ysabel, Problemas fundamentales del ejercicio del albaceazgo, Madrid, Inst. Ed. Reus, 1963, pág. 71.

 Véanse: Flecha v. Lebrón, 166 D.P.R. 330, 345-368 (2005) (Sentencia), opi-nión de conformidad del Juez Asociado Señor Rebollo López; J. Puig Brutau, Fundamentos de Derecho Civil, 3ra ed., Barcelona, Ed. Bosch, 1990, T. V, Vbl. I, págs. 398-400.

 Véase R. López Vilas, Configuración jurídica del albacea en derecho español, en Estudios de Derecho Civil en honor del Prof. Castán Tobeñas, Pamplona, Eds. Universidad de Navarra, 1969, Vol. VI, págs. 379-421.

 Puig Brutau, op. cit., pág. 457.

 Albaladejo, op. cit., págs. 373-374.

 Puig Ferriol, op. cit., págs. 226-227. Sobre los herederos como continuación de la personalidad del causante, véase Torres, Torres v. Torres et al., 179 D.P.R. 481, 496-497 (2010).

 Puig Brutau, op. cit., pág. 460.

 (Cita omitida.) Puig Ferriol, op. cit., págs. 223-224.

 Albaladejo, op. cit., pág. 371.

 García Ramis v. Serrallés, 171 D.P.R. 250, 251 (2007).

 Art. 597 del Código Enjuiciamiento Civil, 32 L.P.R.A. sec. 2571.

 Art. 820 del Código Civil, 31 L.P.R.A. sec. 2517.

 In re Estate of Young, 4 Ohio App 2d 315, 321 (1964); citado por el Tribunal Supremo de Ohio en In re Estate of Henne, 421 N.E.2d 506, 509 (1981). Los criterios que cita este caso del foro apelativo de Ohio fueron tomados de una sección de la compilación de jurisprudencia estatal American Law Reports. 18 A.L.R. 2nd 633 (1951), sustituida por 11 A.L.R. 4th 638 (Sup. 2011). Sobre el problema que conlleva *885 utilizar decisiones aisladas como fuentes de derecho comparado, véase H.C. Gutte-ridge, El derecho comparado: introducción al método comparativo en la investigación y en el estudio del derecho, Barcelona, Ed. Instituto de Derecho Comparado, 1954, págs. 141-151.

 Opinión mayoritaria, págs. 851-857. La Opinión mayoritaria llega a la misma conclusión que nosotros sobre el elemento de fiducia del albaceazgo, pero por un camino distinto y, a mi entender, innecesario. De hecho, las fuentes legislativas estatales que utiliza se refieren a la idoneidad del albacea, pero no definen dicho concepto. Por eso, la mayoría parece sentirse obligada a recurrir a la interpretación que le han dado los tribunales de esos estados en casos particulares aislados.

 Véanse: González Tejera, op. cit., pág. 567; Flecha v. Lebrón, supra, págs. 374-375, 385-386 y 390-391.

 Para una descripción detallada del método general empleado en derecho comparado, que incluye la selección del asunto de la comparación, la descripción de las normas y sus contextos, y el análisis de similitudes y diferencias, véase G. Dan-neman, “Comparative Law: Study of Similarities or Differences?”, en M. Reimann y R. Zimmermann (eds.), The Oxford Handbook of Comparative Law, Oxford, Oxford University Press, 2006, Cap. lí, págs. 406-418.

 Véase R. David y J.E. Brierley, Major Legal Systems in the World Today: An Introduction to the Comparative Study of Law, London, Ed. Stevens and Sons, 1985, págs. 14-16.

 Cuando este Tribunal ha tenido que enfrentarse a controversias sobre el tema del albaceazgo, la incompatibilidad de las disposiciones del Código Civil de origen español con las de origen angloamericano del Código de Enjuiciamiento Civil ha sido un problema recurrente. Por ejemplo, en Flecha v. Lebrón, supra, se discutió el alcance de las facultades del albacea, que eran más amplias en el Código de Enjuiciamiento Civil. Asimismo, en Mercado v. Mercado, supra, el conflicto surgió porque el Código Civil indica que el cargo de albacea es gratuito, mientras el Código de Enjuiciamiento Civil establece un esquema de compensación para los albaceas. Además, en Andino v. Andino, 83 D.P.R. 138 (1961), el Tribunal armonizó la acepta-ción del cargo de albacea a través de cartas testamentarias dispuesta en el Código de Enjuiciamiento Civil con la aceptación tácita del cargo que establece el Código Civil.

 Véanse: M.A. Glendon, M.W. Gordon y C. Osakwe, Comparative Legal Traditions, Minnesota, West Publishing Co., 1985, págs. 11-14; L.J. Constantinesco, Ti'atado de Derecho Comparado, Madrid, Ed. Tecnos, 1981, Vol. I, págs. 318-329.

 E. González Tejera, Derecho de sucesiones. Tomo 1: la sucesión intestada, San Juan, Ed. U.P.R., 2001, pág. 252.

 J.A. Cuevas Segarra y A. Román García, Derecho Sucesorio Comparado (Puerto Rico y España), San Juan, Pubs. JTS, 2003, pág. 364.

 Planellas v. Pastrana, 63 D.P.R. 285, 290 (1944).

 Ab Intestato Balzac Vélez, 109 D.P.R. 670, 678 (1980).

 Art. 556 del Código Enjuiciamiento Civil, 32 L.P.R.A. sec. 2361.

 32 L.P.R.A. sec. 2363.

 Ab Intestato Balzac Vélez, supra, págs. 678-679; Finlay, Waymouth & Lee y C. Armstrong e Hijos, 42 D.P.R. 845, 851 (1931).

 La Opinión mayoritaria reconoce que, “en estricto derecho!,] se puede nom-brar un administrador judicial para la Sucesión Vilanova Díaz ...”. Opinión mayori-taria, pág. 86.

 Testamento de 1994, Cláusula vigésimo primera. Caso Núm. CC-2009-0591, Apéndice, pág. 62.

 31 L.P.R.A. sec. 2876.

 El Estado interviene por cuestiones de interés público. Véase González v. Tribunal Superior, 97 D.P.R. 804 (1969), en el que el Tribunal intervino para impedir el discrimen por razón de género entre los miembros de una sucesión.

 Art. 624 del Código Civil, 31 L.P.R.A. sec. 2129; González Tejera, Derecho de sucesiones. Tomo IT. la sucesión testamentaria, op. cit., págs. 334-336.

 En el caso de expedición de cartas testamentarias, el foro apelativo basó su decisión de autorizarlas en que el testamento se reputará válido mientras no se declare su invalidez, a pesar de reconocer que la decisión en torno a la validez del testamento afectaría el nombramiento de la albacea.

 Silva Oliveras v. Durán Rodríguez, 119 D.P.R. 254, 264 (1987).

 32 L.P.R.A. sec. 2361. Véase Solicitud de intervención; oposición a expedi-ción de cartas testamentarias; descalificación de albacea; aceptación de herencia a beneficio de inventario, presentada en el Tribunal de Primera Instancia de San Juan, el 12 de marzo de 2008, Caso KJV 2008-0528. Caso Núm. CC-2009-0591, Apéndice, pág. 70.

 Ab Intestato Balzac Vélez, supra, pág. 680.

 La solicitud se presentó en el Tribunal de Primera Instancia en el caso KJV 2008-528, que es el número que le asignó ese foro al caso sobre cartas testamenta-rias, que luego consideró el Tribunal de Apelaciones bajo el número KLANO801547, y que este Tribunal está atendiendo en la presente opinión. A ese caso se le asignó el número CC-2009-0591 en el Tribunal Supremo y se consolidó con el caso CC-2009-0303 sobre sustitución de parte, pues las partes eran las mismas y las controversias están íntimamente ligadas. Si la petición de administración judicial no se resolvió en el tribunal de instancia fue porque el caso en el que se presentó se desestimó en ese foro. Entonces, no se puede concluir que el interés de las partes en la administración judicial surgió luego de la Sentencia del tribunal apelativo y, mucho menos, que es un remedio que sugirió el Tribunal Supremo. Aun cuando fuera así, no sería impro-pio, pues los tribunales pueden conceder los remedios que procedan en derecho, según las alegaciones y la prueba, aunque las partes no los hayan solicitado. Reglas 42.4 y 71 de Procedimiento Civil de 2009 (32 L.P.R.A. Ap. V). Las Reglas de Proce-dimiento Civil de 1979 disponían lo mismo. 32 L.P.R.A. Ap. Ill, R. 43.6 y R. 70. Véase J.A. Cuevas Segarra, Tratado de Derecho Procesal Civil, San Juan, Pubs. JTS, 2000, T. II, págs. 704-707. Además, este Tribunal ha rechazado la idea de que una parte no puede variar su teoría del caso en su recurso apelativo. Sánchez v. Eastern Air Lines, Inc., 114 D.P.R. 691, 694-695 (1983). Véase, también, Valentín v. Housing Promoters, Inc., 146 D.P.R. 712, 719 (1998).

 por 0j.ra parte, en Cabanillas v. Torrent, 32 D.P.R. 42 (1923), confirmamos el nombramiento de un administrador judicial para conservar los bienes en lo que se decidía si eran privativos del causante o gananciales, aun cuando en el testamento se había nombrado un albacea, quien no había aceptado el cargo. En ese caso, indica-mos que la presencia de un contador partidor tampoco impide la administración judicial de los bienes. Véanse, también: Ab Intestato Balzac Vélez, supra, pág. 678; Pérez et al. v. Alvarez, 32 D.P.R. 157 (1923).

 Ab Intestato Marini Pabón, 107 D.P.R. 433, 437 (1978).

 32 L.P.R.A. sec. 2369. En Ex parte Detrés, 67 D.P.R. 381, 384-385 (1947), señalamos que la preferencia que establece el Artículo 564 a favor del cónyuge viudo no es absoluta y puede nombrarse a otra persona si se determina que el viudo o la viuda no puede ejercer el cargo. En Ríos, Ex parte y Martínez, opositora, 67 D.P.R. 418 (1947), no se dio preferencia a la viuda porque no residía en Puerto Rico.

 Ab Intestato Balzac Vélez, supra, pág. 678.

 Art. 567 del Código Enjuiciamiento Civil, 32 L.P.R.A. sec. 2372.

 Arts. 568-570 del Código Enjuiciamiento Civil, 32 L.P.R.A. secs. 2401-2403.

 Art. 571 del Código Enjuiciamiento Civil, 32 L.P.R.A. sec. 2431.

 González Tejera, Derecho de sucesiones. Tomo 1: la sucesión intestal, op. cit, pág. 263.

 Art. 584 del Código Enjuiciamiento Civil, 32 L.P.R.A. sec. 2471. El adminis-trador judicial, por la representación que le concede la ley, y los herederos, como partes realmente interesadas, deben actuar conjuntamente en todos los litigios que se promuevan a favor o contra el caudal hereditario. Descartes, Tes. v. Tribl. Contribuciones y Cerra, Int., 74 D.P.R. 567, 574 (1953); Franceschi v. Corte, 45 D.P.R. 666, 676 (1933). Ante la situación conflictiva en este caso, esa actuación conjunta se daría a través del administrador como representante de la Sucesión, en lugar de la inter-vención directa de ambos en el litigio.

 Yumet v. Tribunal Superior, 80 D.P.R. 680, 698 (1958).

 Echevarría Jiménez v. Sucn. Pérez Meri, 123 D.P.R. 664, 684 (1989).

 Cuevas Segarra, op. cit., T. I, pág. 454.

 íd.; 32 L.P.R.A. Ap. V, R. 22.1(b).

 Lluch v. España Service Sta., 117 D.P.R. 729, 750 (1986); Carrasco v. Auffant, 77 D.P.R. 156, 160 (1954).

 Recordemos que los derechos sucesorios no se limitan al derecho a recibir bienes del caudal. Véanse: Arts. 599-602 del Código Civil, 31 L.P.R.A. sees. 2081-2084; Torres, Torres v. Torres et al., supra, págs. 496-497; Feliciano Suárez, Ex parte, 117 D.P.R. 402, 412-414 (1986); González Tejera, Derecho de sucesiones. Tomo 1: la sucesión intestal, op. cit., págs. 1-2.

 Pereira v. I.B.E.C., 95 D.P.R. 28, 66 (1967).